# THEOBALD v. ST. LOUIS TRANSIT COMPANY, Appellant.

### Division One, November 22, 1905.

1. **JUROR: Fairness.** There is no feature of a trial more important and more necessary to the pure and just administration of the law than that every litigant be accorded a fair trial before a jury who enter upon the trial wholly disinterested and unprejudiced.

2. ———: **Voir Dire: Prejudice.** In a suit for personal injuries against a street railway, a juror on his *voir dire* stated that eight or nine years previously he had been thrown off of a street car, and that that fact would influence him in the trial of the cause. He also stated that he would be governed by the testimony and instructions, and believed he could render an impartial verdict; that he had nothing against the defendant, but that he had during all those years entertained a prejudice against street car companies, and that that prejudice existed when he was first examined as to his qualifications but that during the examination that prejudice had been removed, and that he had reached the conclusion within the five minutes occupied by the examination that he could try the case fairly and impartially. *Held,* that he was not a competent juror.

3. ———: ———: ———: **Against Company and Its Employees.** A juror on his *voir dire* stated he had a sort of prejudice against the defendant street railway company, but that he did not think it would influence his verdict, yet added: "But still a person having a prejudice,—that unconsciously would bias his opinion; I would give more preference to the testimony of a non-employee of the company than I would an employee," and explained that he meant by that that he would consider the interest of an employee in determining the credibility of his testimony. *Held,* that the defendant's challenge of the juror should have been sustained.

4. ———: ———: **Determination of Qualification.** It is for the court, and not for the juror, to determine his qualification. That determination should not be made to depend upon the conclusions of the juror as to whether or not he could or would divest himself of a prejudice he admits exists in his mind.

5. ———: ———: ———: **Conclusiveness: Discretion: Finding of Fact.** The ruling of the trial court that a juror is qualified is not conclusive, but is subject to review on appeal, especially

where the facts are undisputed. The trial court exercises a judicial discretion in determining the juror's qualifications, but its rulings thereon are reviewable in the appellate court as are other acts involving the judicial discretion of the trial judge. It is not the law that the determination by the trial judge of questions of fact touching the juror's qualifications is final.

6. ————: **Existing Prejudices: Evidence Necessary to Remove.** No man is a fair and impartial juror who enters upon the trial of a cause with a prejudice that it would require a considerable amount of evidence to remove. [Criticising State ex rel. v. Bank, 80 Mo. 1. c. 632.]

7. ————: ————: ————: **Additional Burden.** There is no reason why a litigant in a civil case should have the burden of removing from the mind of a juror an admitted prejudice against him.

8. ————: ————: **Voir Dire: Peremptory Challenges As Cure.** The determination of the juror's unprejudiced qualification should be determined wholly independent of any consideration of whether the party aggrieved had or had not exhausted his peremptory challenges. Each party is entitled to a panel untinctured and untainted by personal whim, bias or prejudice.

9. **NEGLIGENCE: Street Car: Rate of Speed.** A speed of eight or fifteen miles an hour, in the outskirts of a great city, over an unimproved street, is not of itself a dangerous rate of speed for an electric street car with a headlight, although the night is dark and there are no street lights.

10. ————: ————: **Vigilant Watch.** If it was the duty of the motorman in charge of an electric car to anticipate that persons would likely be traveling on the unimproved street at six o'clock of an evening in January, returning from the then World's Fair grounds, and to sound the gong and warn persons so traveling over the street of the car's approach, it was also the duty of a person driving a wagon on the car tracks to know that cars were constantly passing over the same and take proper precautions to get off of the track in time to avoid a collision.

11. ————: ————: ————: **Dark Night: Discovery of Traveler: Closing Door: Demurrer.** Where there is no evidence that if the motorman had been constantly and vigilantly looking ahead he could have seen the running-gear of a wagon on the track in front of the car in time to have avoided hitting it, it cannot be said that he was guilty of a breach of duty in turning for a moment just before he discovered the presence of the wagon to close the door of the car which the conductor had left open.

And where there is positive evidence that he could not have seen the wagon sooner had he been looking, and that he diligently employed every instrumentality at hand to avoid collision after discovering it, the appliances being reasonably safe and the case being bottomed on his failure, after he had discovered or by the exercise of ordinary care could have discovered the wagon on the track, to stop the car in time to have avoided the accident, the court should have sustained a demurrer to the evidence.

12. ———: ———: ———: **Instruction: Degree of Care: "Constant and Vigilant Watch."** Just before the motorman saw the running gear of a wagon traveling on the street car track in front of the car, he turned and closed the door, which the conductor had left open, and the court told the jury that it was his duty "to keep a constant and vigilant watch ahead." *Held,* under the circumstances, the action being one of common law negligence, that the words "constant" and "vigilant" exacted a higher degree of care than the ordinary care which the law imposed. **[Per Marshall, J.]**

Appeal from St. Louis City Circuit Court.—*Hon. H. D. Wood,* Judge.

REVERSED.

*Glendy B. Arnold* for appellant; *Boyle, Priest & Lehmann* and *George W. Easley* of counsel.

(1) The court erred in overruling defendant's challenges to jurors Hartman and Bensberg. Billmyer v. Railroad, 108 Mo. App. 6; People v. Reyes, 5 Cal. 347; Ins Co. v. Schueller, 60 Ill. 465; McLaran v. Birdsong, 24 Ga. 365; Doherty v. Lord, 28 N. Y. Supp. 720; Commonwealth v. Brown, 9 Am. St. Rep. note, p. 744; Const., art. 2, sec. 28. (2) The court erred in refusing to give to the jury defendant's instruction in the nature of a demurrer, offered at the close of plaintiff's evidence and renewed at the close of the whole case. McGauley v. Railroad, 179 Mo. 583; Reno v. Railroad, 180 Mo. 469; Roenfeldt v. Railroad, 18 Mo. 534; Zurfluh v. Railroad, 46 Mo. App. 636. (3) Instruction 2 given for plaintiff is erroneous. There is no reliable evidence

in the record that the car was being run at a negligent
speed. The witnesses testifying in support of this
charge showed no qualification whatever to give such
evidence. Petty v. Railroad, 179 Mo. 666; Mathieson
v. Railroad, 92 N. W. 639; Hoppe v. Railroad, 161 Wis.
357. (4) The court erred in giving instruction 3.
This instruction was error because it required the mot-
orman to keep constant and vigilant watch on the track
ahead. This is not the law. The motorman is required
to use ordinary care only in watching for persons on or
approaching the track. (5) Instruction 6 should not
have been given. The humanitarian rule is not appli-
cable to the facts in this case. McGauley v. Railroad,
supra; Holwerson v. Railroad, 157 Mo. 216. (6) De-
fendant's refused instruction 6 should have been given,
as follows: "If the injury and death of deceased was
due to or caused by the mutual or joint negligence of
deceased and defendant's motorman, then the plaintiff
cannot recover." Boyd v. Railroad, supra; Watson v.
Railroad, supra; McManamee v. Railroad, 135 Mo. 440;
Kries v. Railroad, 148 Mo. 321; Peterson v. Railroad,
156 Mo. 552; Holwerson v. Railroad, supra; McCarty
v. Rood Hotel Co., 144 Mo. 402; Kelney v. Railroad, 101
Mo. 67; Tanner v. Railroad, 161 Mo. 497; Conrad Gro-
cer Co. v. Railroad, 89 Mo. App. 534; Graham v. Rail-
road (N. H.), 55 L. R. A. 426, and note.

*Scullin & Chopin* and *Daniel Dillon* for respond-
ent.

(1) The trial judge is the proper person to deter-
mine the qualification of a juror, and the cases are
unanimous in holding that his findings on this subject
are to be treated as findings on any other question of
fact, and will not be disturbed unless an abuse of discre-
tion is shown. State ex rel. v. Bank, 80 Mo. 632;
Thompson on Trials, sec. 100; State v. Walton, 74 Mo.
270; State ex rel. v. Chatham Bk., 80 Mo. 627; State v.

Williamson, 106 Mo. 162; State v. Bauerle, 145 Mo. 15; Montgomery v. Railroad, 90 Mo. 446; McCarty v. Railroad, 92 Mo. 536; State v. Cunningham, 100 Mo. 386. (a) But even if the court erred in overruling the challenges to the proposed jurors, it worked no prejudice to defendant, and is no reason for reversing the judgment. The record shows that neither of the two jurors who were challenged were on the jury who were finally selected to try the case. As defendant had an unobjectionable jury to try the case, it could ask nothing more. If a cause has been tried before a competent, impartial and unobjectionable jury, the defeated party has no ground of complaint so far as the jury is concerned. The object of the law is to secure just such a jury, and when that has been accomplished the purpose of the law is fulfilled. Burt v. Panjaub, 99 U. S. 180; Hayes v. Missouri, 120 U. S. 71; Woolen v. State, 99 Tenn. 200; N. P. R. v. Herbert, 116 U. S. 642; Spies v. Illinois, 123 U. S. 168; Pool v. Ins. Co., 94 Wis. 453; Finkelstein v. Barnett, 17 Misc. 564; Ferridy v. Silser, 4 How. (Miss.) 519; Barnett v. Dalton, 69 Miss. 617; State v. Tibbs, 48 La. Ann. 1281; State v. Willis, 43 La. Ann. 406; Rash v. State, 61 Ala. 90; Mabrey v. State, 50 Ark. 498; Holt v. State, 9 Tex App. 579; Bank v. Schufelt, 82 S. W. 927. The decisions in Missouri are in harmony with the foregoing. Lisle v. State, 6 Mo. 432; Ecket v. Transfer Co., 2 Mo. App. l. c. 43; O'Brien v. Iron Works, 7 Mo. App. 257; Hegney v. Head, 126 Mo. 626. Under our statute, section 865, Revised Statutes 1899, this court will not reverse the judgment unless it shall believe that error was committed against appellant and materially affecting the merits of the action. This section being section 2303, Revised Statutes 1889, is referred to in the opinion in Hegney v. Head, supra. (b) In cases where it is held that the error of the court is not cured by excluding the objectionable juror by means of peremptory challenge, if in excluding such juror the party exhausts his peremptory chal-

lenges, it must further be shown that a juror was forced on the party against his will after he had exhausted his peremptory challenges. In other words, if no objection is made against any of the jurors who tried the case, there was no ground to complain. Thompson on Trials, secs. 114, 115, 120; Spies v. People, 122 Ill. 257; Pool v. Ins. Co., 94 Wis. 453; Ford v. Umatilla County, 15 Ore. 313; Colton v. State, 32 Tex. 642; Holt v. State, 9 Tex. App. 579; Johns v. State, 55 Md. 363; Bank v. Schufelt, 82 S. W. 927. (c) Even in cases where it was said that the error in overruling challenge might not be cured, if the party exhausted his peremptory challenges in getting rid of the objectionable juror, it was held that it must be made to appear affirmatively by the record that party had exhausted his peremptory challenges. Burt v. Panjaub, 99 U. S. 181; Haggard v. Petterson, 107 Iowa 419; State v. Smith. 49 Conn. 376; State v. Stockman, 58 Pac. 1032, 9 Kan. App. 422; Railroad v. Wissendorf, 39 S. W. 132, 69 Tex. 650; Pool v. Ins Co., 94 Wis. 453; State v. Kluesman, 53 Minn. 541; People v. McGungill, 41 Col. 429; Fleeson v. Mining Co., 3 Nev. 164; Ford v. Umatilla County, 15 Ore. 313; Railroad v. Terrell, 69 Tex. 651; Snow v. Starr, 75 Ky. 414; Wolf v. Perryman, 82 Tex. 115; Mabrey v. State, 50 Ark. 498; People v. Rush, 113 Mich. 541; People v. Fowler, 104 Mich. 449; Bank v. Schufelt, 82 S. W. 927. (2) The second point made in appellant's brief is that the court erred in refusing defendant's instruction in the nature of a demurrer to the evidence. There was no error in refusing this instruction. In no view of the case, consistent with the evidence, would the court have been justified in taking the case away from the jury. Ayers v. Railroad, 190 Mo. 228; Schafstette v. Railroad, 175 Mo. 142; Schaub v. Railroad, 87 S. W. 85. In considering whether or not the court did right in refusing at close of plaintiff's evidence to take the case from the jury, the only question to be considered is whether or not the evidence tended

to prove that defendant was guilty of negligence. There is no claim made in appellant's brief that the court ought to have taken the case from the jury on the ground that the negligence of the deceased directly contributed to his injury. On the evidence no such claim could be made. The law presumes that the deceased was in the exercise of ordinary care until the contrary is made to appear. Busching v. Gas Light Co., 73 Mo. 219; Wilbur v. Railroad, 164 Mo. 198. (3) The third point in appellant's brief is that the court erred in giving plaintiff's instruction 1. The objection which appellant urges against this instruction is that it authorized a recovery if deceased was not warned of the approaching car by gong or otherwise. The instruction further required the jury to find that the failure of the motorman to sound his gong or warn the deceased in any manner of the approach of the car directly contributed to, and was the proximate cause of the collision, and that the deceased was in the exercise of ordinary care. If the deceased was free from negligence in being on the track, as the jury were required to find under this instruction, then under the circumstances shown by the evidence, it was the duty of the motorman to sound his gong or give some warning of the approach of the car, and not run into deceased from behind without any warning whatever. And the motorman knew that this was his duty, for he said he never came down there at that time of night without ringing the bell. And if the failure of the motorman to ring his bell on this trip was the direct cause of the collision, then defendant was liable. In any view of the evidence, it was incumbent on the motorman to give warning of the approach of his car and not run into the wagon without warning. If there was light enough to see the wagon far enough ahead of him, certainly he should have given warning before running into the wagon. If it was so dark that he could not see a wagon on the track in time

to avoid colliding with it, it certainly was his duty to ring his bell and give notice to drivers of teams who might be on the track ahead of him of the approach of the car. Many teams traveled that street and they all drove in the tracks, as horses could not walk on the street outside the tracks. Consequently the motorman knew that it was almost certain that there would be vehicles on the track in front of him as he came down that street that evening. The statement in this connection, made in defendant's brief, that the deceased had as good, if not better, opportunity to discover the car and avert injury than the motorman had to discover the deceased and avoid the collision, is unreasonable. It can only be characterized as absurd to say that a man driving his team and necessarily looking forward, has as good an opportunity to notice a car approaching his wagon from the rear, as the motorman in front of the car and looking forward had to see the wagon in front of him. (4) Appellant next contends that instruction 2 given by plaintiff is erroneous. This instruction required the jury to find that the deceased was exercising ordinary care, and that the negligent speed was the direct and proximate cause of the collision. The objection made to this instruction is that there is no reliable evidence that the car was running at negligent speed. The testimoney tended so clearly to show negligence in regard to speed that we will consume no more space in discussing it, except to say that it would be for the jury to say if even ten miles an hour would not have been negligence under the conditions. (5) Appellant objects to instruction 3 given for plaintiff, because it required the motorman to keep a constant and viligant watch on the track ahead. This instruction also required the jury to find that the failure of the motorman to keep such watch directly contributed to and was the proximate cause of the death of the deceased, and that the latter was at the time of the collision exercising ordinary

care. If, under the conditions surrounding the running of that car along that street that evening, anything should occur that would render it necessary that the motorman should quit his watch ahead for even a short while, common ordinary prudence would say to stop the car, or at least reduce its speed to a very low rate. Fearons v. Railroad, 180 Mo. 208; Murrell v. Railroad, 105 Mo. App. 88; Ayers v. Railroad, 190 Mo. 228; Heinzle v. Railroad, 182 Mo. 528.

MARSHALL, J.—This is an action for $5,000 damages arising from the death of the plaintiff's nineteen-year old son, about six o'clock in the afternoon on the 20th of January, 1903, caused by one of the defendant's cars colliding with the rear of a wagon driven by the deceased, at a point seventy to one hundred fifty feet west of Union avenue on De Giverville avenue, in the city of St. Louis. There was a verdict and judgment for the plaintiff for $5,000, and the defendant appealed.

The negligence charged in the petition is as follows:

"Plaintiff's state further that said death was caused by the negligence of defendant's servants on said car in carelessly and negligently managing the same, in failing to sound the bell, or in any other manner warning their son of the approach of the car, in failing to keep a watch for vehicles on the track in front of the car, in failing to stop said car, after the danger to their son became apparent, or by the exercise of ordinary care would have become apparent, and by running at a high rate of speed."

The answer is a general denial, coupled with a plea of contributory negligence, and an averment that, at the time and place of the accident, it was so dark as to render it impossible for the defendant's motorman to see the deceased upon the track in a place of danger in time, by the use of all the means in his power, to stop the car in time to avoid the accident.

The reply is a general denial.

When the panel of jurors was being examined upon their *voir dire,* it appeared that Rudolph Hartman, Jr., being duly sworn on his *voir dire,* was examined and answered as follows:

"By Mr. Jourdan, counsel for defendant: Q. Have you any claims or suits of any character pending against the Transit Company? A. I had in 1893. I was thrown off a car at Ninth and Geyer avenue, and I still have to wear a belt.

"Q. That was eight or nine years before the Transit Company was organized? A. Yes, sir.

"Q. That was one of Mr. Scullin's lines? A. Yes, sir.

"Q. What was known as the Union Depot Railway? A. Yes, sir.

"Q. Now, would the fact that you received an injury resulting from an accident influence you in the trial of this case? A. Yes, sir.

"Defendant challenges juror because of prejudice and for cause.

"By Mr. Scullin: Well, you could be governed by the testimony and the instructions of the court, couldn't you? A. Yes, sir.

"Q. You would listen to the testimony? A. Yes, sir.

"Q. And try to do it impartially? A. Yes, sir.

"Q. And you believe you could, do you not? A. Yes, sir.

"By the Court: Do you think that you might be more or less influenced by the prejudice you have against the company? A. No, sir; I have nothing against the Transit Company, personally.

"Q. I understand you to answer that you had a prejudice against the company? A. No, sir; I have a prejudice against railroad companies—against street car companies.

"Q. But have you any against this defendant? A. No, sir.

"Q. Could you try this case fairly and impartially? A. Yes, sir.

"Q. Without being influenced by any feeling or prejudice at all against the defendant? A. Yes, sir.

"Q. It wouldn't mingle in forming your judgment or opinion? A. No, sir.

"Challenge overruled.

"By Mr. Jourdan: Then what did you mean when you told me, Mr. Juror, that you could not try the case fairly, and that you did have a prejudice? A. If I hear the testimony I will try the case fairly.

"Q. Well, you had no idea that you would try the case without hearing the testimony, had you? A. No, sir.

"Q. Well, did I misunderstand you—didn't you tell me on your examination that you could not try this case fairly and impartially; that you had a prejudice growing out of your accident eight or nine years ago, because you were still compelled to wear a belt or something? A. Yes, sir.

"Q. You told me that? A. Yes, sir.

"Q. Now, have you still that prejudice? A. No, sir.

"Q. Well, when was it removed? A. That was removed just now.

"Q. You mean that although you have had this prejudice since 1893, up to the time you answered my question a moment ago— A. I have not got a prejudice now. I have tried other cases.

"Q. I am not asking you about others, Mr. Hartman. All I want is a fair and impartial jury. You told me you were prejudiced and you couldn't try this case, when I asked you not five minutes ago. Now, you say you have no prejudice, is that true? A. I have no prejudice now.

"Q. Although it had lasted from the time of your injury up to the time you were called into the box? A. Yes, sir.

"Q. Now, do you mean to say that you could try this case as you would a lawsuit between two individuals growing out of a breach of contract? A. Yes, sir.

"Q. You have no feeling either for or against the plaintiff or the defendant? A. No, sir.

"Q. Your mind is in that condition that you could go into the jury box and try it according to the testimony and the law, and absolutely nothing else? A. Yes, sir.

"Q. And you have reached that conclusion within the last five minutes? A. Yes, sir.

"Defendant renews challenge because of prejudice and for cause. Overruled. To which ruling of the court defendant then and there excepted."

Ferdinand A. Bensberg, being duly sworn on his *voir dire,* was examined and answered as follows:

"By Mr. Jourdan, counsel for defendant: Q. Do you know of any reason why if selected as a juror you could not try this case fairly and according to the testimony and the law? A. I have a sort of prejudice against the company, a general prejudice.

"Q. That wouldn't influence you in the trial of the lawsuit, would it? A. No, I don't think it would, but still a person having a prejudice, that would probably unconsciously bias his opinion.

"Q. Well, do you feel that by reason of that prejudice your opinion of the testimony or the law might be biased against the defendant? A. No, I would try the cause according to the testimony, but unconsciously my opinion would be biased and I would give more preference to the testimony of a non-employee of the company than I would an employee.

"Defendant challenges juror because of prejudice and bias and for cause.

"By the Court: You mean by that you would allow the fact that the party was interested as an em-

ployee to control your judgment as to the credibility of his evidence? A. Yes, sir.

"Q. Would your opinion be the same as to parties who were interested on behalf of the plaintiff? A. Well, if they had a direct interest in it, then, of course, I would treat them the same way—if they were directly interested.

"Q. In other words, while considering the credibility of witnesses you would consider what interest, if any, they might have in regard to the matter in controversy—that is what you mean? A. Yes, sir, that is what I mean.

"Q. Do you think you could fairly try the case under the evidence and the instructions of the court and render a just verdict? A. Yes, sir, I think I could.

"Challenge overruled.

"By Mr. Jourdan: Mr. Juror, as I understand you, you would go into the jury box with the presumption that the defendant was at fault? A. No, I couldn't say that.

"Q. Well, that the plaintiff ought to recover? A. No, I couldn't say that.

"Q. Well, that the defendant's employees, if they may be called as witnesses, will not testify truthfully? A. Well, a person might testify truthfully, too, but you wouldn't get the same testimony as you would if they didn't have an interest in the result.

"Q. Well, an employee cannot have any interest in the result of this lawsuit? A. Well, that's the way I look at it.

"Q. You indulge the presumption that there is an interest, and that, therefore, they will not testify as truthfully as though they were not? A. I give you my opinion.

"Q. Well, really, Mr. Juror, I don't understand your position now. That is the reason I am asking

these questions. A. Well, as I said before, I have a prejudice against the company to start with.

"Q. You still have the prejudice? A. Still have it.

"Q. And you also have a prejudice against the testimony of employees? A. I wouldn't give it the same preference that I would the evidence of a person who was not an interested party on either side—more so an employee of the company.

"Challenge renewed for cause stated. Overruled. To which ruling of the court defendant then and there excepted."

The plaintiff adduced the following testimony:

The plaintiff, himself, testified that his son was nineteen years old, unmarried, and engaged in the business of a teamster at the time of his death.

Gustav Eckhardt testified that he was a teamster, working for the same company as deceased, and saw him at the World's Fair grounds on the 20th of January, 1903, about five o'clock in the evening; that De-Giverville avenue is a public highway running east and west on which the defendant has double street car tracks; that the distance between the car tracks and the curb stone is about twelve feet. On direct examination, when asked as to the condition of the street outside of the car tracks, he said he would not call it a street at all, and when asked why he would not call it a street, he said, "It ain't made." He further said that on the block west of Union avenue, "there is a little better road, but last winter the road was pretty rough on both sides." When asked if he meant by rough that there was no macadam there, he answered, "No, coming down a pretty hard walk for the horses." On cross-examination, after stating that he would call it a rough road, and asked whether other than being rough, it was a bad place to travel, he answered: "Well, the road was not in a condition to travel outside at all. All the teams used to take the car track.

Q. That was because the road was rough? A. Yes, sir. Q. The track was smoother than the road, that is the reason, isn't it? A. Yes, sir, the horse couldn't walk outside the track at all."

The witness testified that there were no street lights on De Giverville avenue, but he thought there was one at the corner of Union and De Giverville avenues.

Carren Dunn, a laborer at the World's Fair grounds, testified that he was a passenger on the rear platform of the car and knew nothing of the accident until the collision occurred. He said the car was going very hard; that no bell was rung to his knowledge; that he did not hear the bell rung when the car was coming down De Giverville avenue. On direct examination he said that it was not a dark night but that it was cold and clear, and on cross-examination he testified that "it was kind of dark," that he did not know how far one could see; that there were no street lights on De Giverville avenue.

August Kuhne testified that he was working for the Koken Barber Supply Company; was eighteen years old; was a passenger on the car, riding on the front platform in company with his brother. When asked at what speed the car was running, he said: "Well, I just could not tell, but he was going at a good speed. Q. He was going at a good rate of speed? A. Good rate of speed, yes, sir." That prior to the accident the bell on the car was not rung; that just before the accident the conductor came to the front platform and asked him and his brother if they wanted transfers, and upon their replying they did, the conductor said, "Wait a minute," and left the front door open; that the motorman turned and closed the door and then "went back to work at his brakes, and he tried to stop but it was too late;" that the motorman applied the reverse power after he had struck the wagon. And when asked if he saw the man driving the wagon (it

was a lumber wagon without a bed on it) before the car had struck it, he said, "Well, we just about saw the wagon before it was struck; about a second, and after they hit it, that is all we saw of the wagon; just as we looked, why he had hit it. Q. Prior to that time had you been looking in front of the car? A. No, sir, we just happened to turn' around, and just as we saw the motorman grab for his brakes, we was looking that way when he hit him. It was a lumber wagon; there was a headlight on the front of the car; could not tell how far it threw its rays."

Otto Kuhne testified that he was a musician, and was a passenger on the car and was seated inside the car about the center thereof, talking to a friend; that just prior to the accident he heard no gong sounded; that the first thing that attracted his attention was the collision. When asked as to the rate of speed the car was traveling, he answered, "About fifteen miles an hour, I estimate it. I think something like that." When asked as to the character of the night, he said, "I think it was kind of dark but it was clear; stars were out you know." The weather and track were dry.

Ed Kuhne testified that he was a passenger, riding on the front platform of the car; that the conductor came out and asked him and his brother if they wanted transfers, and upon their replying they did, the conductor went back into the car and left the door open, "and just then the motorman turned around and tried to close the door. By that time he had hit the wagon." When asked as to the rate of speed the car was traveling just prior to the accident, he said, "Why, at a good rate of speed. Q. About how many miles an hour? A. Well, I estimate it at fifteen miles an hour. Q. Did the motorman reverse his car? A. Yes, sir. Q. At what time? A. Why, just a few feet; I guess when he seen he was right up against the wagon, then he reversed it. Q. What kind of a night was it, Mr.

Kuhne? A. Why, it was kind of chilly night, but it seemed to be clear. Q. Stars were out? A. Yes, sir. Q. You say the motorman reversed the car a few feet before he struck the wagon? A. Why, just as soon as he seen the wagon. I don't know how far it was. Seemed to me about six or eight feet.''

On cross-examination he testified: ''Q. And you say the night was dark? A. The night was dark. Saw no lights on De Giverville avenue. Q. And almost instantly after you saw this wagon which direction were you looking—were you looking in front or in the rear? A. I wasn't looking out the front; we was kind of joking and talking and not noticing anything. Q. The first thing you noticed with reference to the accident was reversing the car, was it not? A. Well, I seen the sudden jerk the motorman gave, and I thought, well, something is turning up. Q. And he [the motorman] saw the wagon before you did. A. Well, I think he did.'' Witness testified that he didn't know how far the car went after the collision before it stopped. That he thought one horse was knocked down. That the deceased was lying on the track in front of the car after it was stopped.

That was all the testimony for the plaintiff on the case in chief. The defendant demurred to the evidence. The court overruled the demurrer and the defendant excepted.

The defendant introduced testimony as follows:

George Eoff testified that he was the motorman of the car, which was east-bound on De Giverville avenue; that the collision occurred about one hundred and fifty feet west of Union avenue; that the car was running about eight or ten miles an hour just prior to the accident; that he didn't see the wagon until about within twenty-five feet of it; that he could not see more than twenty-five feet ahead of the car because of the darkness; that immediately on seeing the wagon he applied the reverse power and brakes and all the ap-

pliances for stopping the car, but that it was too late to stop and the car struck the coupling pole of the wagon; that he was keeping a lookout ahead; that he didn't turn around to close the door just before striking the wagon; that he might have done that before, but not just prior to the accident; that it was a dark night and there were no lights on De Giverville avenue; that the wagon was an empty lumber wagon, skeleton frame, no bed, nothing but running gear, and had no lights on the wagon and that it was very difficult to see; that the wagon was not knocked off the track and the car did not run over the deceased; that the car ran about fifteen feet after striking the wagon before it was stopped; that the car had a head-light in front of it, and that he didn't know how far it threw light ahead; that he did not know in what distance a car, under the same circumstances, could have been stopped; that he had full power on when he first saw the wagon, but turned it off and reversed it immediately upon seeing the wagon.

Louis Hall, the conductor in charge of the car, testified he was on the inside of the car at the time of the collision and didn't see the collision; that the car was reversed just before the collision; that the wagon remained on the track in front of the car after the collision; that the collision was not severe and no damage was done to the wagon; that one horse was knocked down.

R. A. Lindsay, a railroad machinist, working for the Nelson Morris Packing Company, testified that he was a passenger on the front platform, standing just behind the motorman at the time of the collision; that it was a dark night; that the car struck the wagon about seventy-five feet west of Union avenue; that just prior to the accident he was standing right in the rear of the motorman; that about a minute before the accident the door had been opened once, "and all at once I seen the motorman take his precautions—what rail-

road men call precautions—he took a rap on his brake and he shut his power off very quickly, and then in a moment I seen him reverse; I braced myself then; I knew what he was going to do. Q. And did you see anything in front? A. Yes, sir, I seen a wagon. Q. How far were you from the wagon when you first saw it? A. About a car length or a car and a half length. Q. And you saw the motorman immediately reverse? A. Yes, sir.'' That the car struck the coupling pole projecting from the rear of the wagon; that the car ran about fifteen feet and stopped after the collision; that just prior to the accident the motorman ''kept up a tattoo with his gong there all the way in.'' On cross-examination he testified that the wagon was from thirty-five to fifty feet ahead of the car when he first saw it.

S. W. Carroll testified that he was a time-keeper at the World's Fair; that he was a passenger on the car, seated inside of the car at the time of the accident; that the car came down De Giverville avenue at a very rapid speed; but as it approached the point of collision, that being near the curve at Union avenue, it slacked up and was going at about one-third of the speed it had been running five hundred yards west of there; that the motorman had to slow down for the curve; that he could not say what the speed was in miles; that it was a very dark night and that immediately prior to the accident his attention was called to the darkness by a fellow passenger, who was riding on the same seat with him; that he did not remember whether the gong was rung or not.

Charles F. Graham testified that he was a civil engineer and an inspector for the World's Fair, and was a passenger on the inside of the car, seated with Mr. Carroll at the time of the accident; that the car was lighted up and the screens were down in front; that the night was very dark, exceedingly so; that prior to the accident he called Mr. Carroll's attention

to the darkness, the night being very dark; that just before the accident he felt a jar or some stopping or slacking of the speed of the car; that in his opinion the car didn't run after it hit the wagon.

John Boatright, a trackman for the defendant, testified that he was a passenger on the front platform of the car at the time of the collision; that the motorman was at his post, looking ahead, one hand on the brake and the other on the controller; that he, the witness, was looking ahead just before and at the time of the collision and saw a wagon on the track about twenty feet ahead; that the motorman reversed the power as quickly as he could; that the minute the motorman saw the wagon he turned his brake and threw the power off and reversed it; that the car struck the coupling pole of the wagon, which stuck out about eight or ten feet behind the hind wheels of the wagon; that after striking the wagon the car ran about ten feet and stopped; that the night was dark and there were no lights on De Giverville avenue; that the gong was sounded quite often before the collision—was sounded just before the car hit the wagon.

Daniel Downey, a police officer, testified that he reached the scene fifteen or twenty minutes after the collision; that the night was dark; that there were no lights on De Giverville avenue; that he took the wagon to a livery stable after the collision and examined it and that it was not injured "a bit;" that there was a light at Union and De Giverville avenues, one hundred and fifty feet from where the car struck the wagon.

This was all the evidence introduced by defendant.

In rebuttal the plaintiff called John Aslag, who testified that he had operated electric cars on Lee avenue in St. Louis for six years and was familiar with electric cars, and appliances for stopping them. The witness was then asked this question: "Q. Well, on an ordinary track on the level, coming at a rate of eight or ten miles an hour, in how many feet can you stop

a car, provided you have the reverse and the brakes and the appliances as you know them?''

Counsel for defendant objected to the question and insisted that it should embody the conditions which existed that night, and should show that the witness had operated the same character of a car with the same character of brakes and reverse power. Thereupon the question was withdrawn, and the following question put to the witness: ''Q. On a frozen track, a crowded car, say with sixty-five passengers aboard, on a level space, with the brake appliance and the reverse appliance, in how many feet can you stop a car going at the rate of eight or ten miles an hour.'' The defendant objected to the question for the same reason as before. The court overruled the objection and the defendant excepted. The witness answered: ''Well, that time when I worked on the road, I could have stopped a car within fifteen feet; that is in 1900, when I was let out.'' That he had worked on the Lee avenue road for seventeen years. On cross-examination the witness testified that he had never run a car on De Giverville avenue, or anywhere else except on Lee avenue; that he had never seen the car in question here, and didn't know what kind of a brake it had or what kind of a reverse or other machinery it had.

This was all the evidence in the case. Thereupon the defendant again demurred to the evidence; the court overruled the demurrer, and defendant excepted.

The ruling of the court in respect to the giving and refusing of instructions is also complained of by the defendant, and will be discussed in the course of the opinion. The plaintiff recovered a judgment for $5,000, and after proper steps the defendant appealed.

## I.

The first error assigned is the ruling of the trial court in overruling the challenge for cause of the jurors Hartman and Bensberg.

Briefly stated the facts developed upon the *voir dire* were, that eight or nine years before the trial the juror Hartman had been thrown off of a car. He stated that that fact would influence him in the trial of this cause. He also stated that he would be governed by the testimony and instructions of the court, and believed that he could render an impartial verdict; that he had nothing against this defendant, but that he had during all those years entertained a prejudice against street car companies, and that that prejudice existed when he was first examined as to his qualifications for a juror, but that during the examination, that prejudice had been removed, and that he had reached the conclusion within the last five minutes that he could try this case impartially.

The juror Bensberg testified that he had a sort of a prejudice against the company, and that he did not think it would influence his verdict as a juror, yet added, "But still a person having a prejudice, that would probably unconsciously bias his opinion." And further added: "I would give more preference to the testimony of a non-employee of the company than I would an employee." Upon the court's suggestion that he meant thereby that he would consider the interest of the employee in determining the credibility of his evidence, the juror acceded to that view. After examination by the court and counsel, the juror was asked: "Q. Well, really, Mr. Juror, I do not understand your position now. That is the reason I am asking these questions. A. Well, as I said before, I have a prejudice against the company to start with. Q. You still have that prejudice? A. Still have it. Q. And you also have a prejudice against the testimony of employees. A. I would not give it the same preference that I would the evidence of a person who was not an interested party on either side—more so an employee of the company."

Under our system of jurisprudence there is no

feature of a trial more important and more necessary to the pure and just administration of the law than that every litigant shall be accorded a fair trial before a jury of his countrymen, who enter upon the trial totally disinterested and wholly unprejudiced. Where a juror admits, as Hartman did, that he had a prejudice against street car companies of eight or ten years standing, and that that prejudice existed up to the time he gave his first answer upon his *voir dire,* yet after being examined and cross-examined by counsel and the court, and being put in the position of having to say he would allow that prejudice to overcome the obligation of his oath as a juror, or on the other hand to say that he could divest his mind of such a prejudice and fairly try a case, and that the prejudice had become dissipated within the last five minutes, it can scarcely be reasonably said that such a juror fills the requirements of our system of jurisprudence.

The juror Bensberg more candidly and accurately stated the conditions existing in such cases when he said: "Well, a person having a prejudice, that would probably unconsciously bias his opinion." The truth of this statement is self-evident. The question of the qualification of a juror is a question to be decided by the court, and not one to be decided by a juror himself. It is the prerogative and duty of the trial court to exercise a wise, judicial discretion in this regard, and the conclusion of the court should rest upon the facts stated by the juror with reference to his state of mind, and should not be allowed to depend upon the conclusions of the juror as to whether or not he could or would divest himself of a prejudice he admitted existed in his mind. And this is true whether the prejudice exists against either of the parties or against the character of the subject-matter in litigation, or against either of the parties as a class, and not against the party as an individual. It is proper to examine a ju-

191 Sup—27

ror as to the nature, character and cause of his preju-
dice or bias, but it is not proper to permit the juror,
who admits the existence in his mind of such prejudice
or bias, to determine whether or not he can or cannot,
under his oath, render an impartial verdict. Such a
course permits the juror to be the judge of his qualifi-
cations instead of requiring the court to pass upon
them as questions of fact.

It is altogether a mistaken idea that the ruling of
the trial court on such questions is conclusive and not
subject to review. In some cases it has been loosely
said that the ruling of the court on such questions is
like the ruling of the trial court in law cases, and that
where there is any evidence to support the ruling, an
appellate court will not review the same. Such ques-
tions generally arise only in cases at law. It is the dis-
cretion exercised by the trial judge which is the sub-
ject of review. In approaching the decision of that
question an appellate court is always guided by the
same rule that obtains with reference to the review of
discretionary judicial acts of inferior tribunals. Great
deference is paid to the finding of a trial judge, but
that finding is not conclusive, and where the facts are,
as here, practically undisputed, such ruling is subject
to review on appeal. Otherwise the whole power and
authority as to the selection of jurors would be vested
in the trial court, and it is against the policy of our
law to permit any ruling in a *nisi prius* court to be
beyond review and correction by an appellate court.
Accorded such a power, all else would be a foregone
conclusion, and a litigant would be entirely at the
mercy of the trial judge, and the usefulness and pro-
priety of appellate courts, would, to a large extent, be
diminished.

This matter has been the subject of much consid-
eration and adjudication not only in this State but
in sister states, and text writers have undertaken to
formulate rules which should be observed in the deter-

mination of the question. An examination of cases cited in the briefs of counsel, shows a vast contrariety of opinion and ruling in cases of this character.

In State ex rel. v. Bank, 80 Mo. l. c. 632, the fact appeared that the juror avowed a prejudice based upon what he had read in the newspapers, and even after the challenge was made and overruled, he stated that he had a prejudice which would require a considerable amount of evidence to remove, and asked to be relieved from sitting. His request was refused, and that ruling was sustained. The ruling was placed upon the ground that the decision of the trial court was like any other decision of fact, and ought not to be disturbed where there was any evidence to support it, and that the trial court was better able to pass upon the question than an appellate court.

Unless the predicate of that ruling is correct there can be no doubt that the juror in that case was not an impartial juror, and should not have been permitted to sit in the trial of the case, for no man is a fair and impartial juror who enters upon the trial of a case with a prejudice that it would require a considerable amount of evidence to remove. The parties litigant are entitled to a jury of men whose minds are not thus imbued, and who do not require a considerable amount of evidence to remove a prejudice before they can decide the issues of fact.

The more correct ruling was stated by BLACK, J., in McCarthy v. Railroad, 92 Mo. l. c. 539, where he said: "It is not every opinion of a juror concerning the matter in litigation, which will operate as a disqualification. To have that effect, it must be such an opinion as will influence his judgment in the consideration of the cause. This is substantially the rule of the statute. [Sec. 2796 (now sec. 3785, R. S. 1899).] Opinions formed, but not of a fixed character, and which readily yield to evidence, do not disqualify the juror. [State v. Walton, 74 Mo. 270.] If he have such a bias or

prejudice against a class of cases that his judgment will be warped, then he should be set aside and not accepted as a juror; but it ought to appear that his bias is such as to influence his judgment. Again, the competency of a juror is a mixed question of fact and law. It is for the court to try this question of fact, and the finding of the trial court as to the competency of the juror ought not to be disturbed, unless it is clearly and manifestly against the evidence. This rule is to be deduced from what has been heretofore said by this court. [Montgomery v. Railroad, 90 Mo. 446; State ex rel. v. Nat. Bank, 80 Mo. 626.]''

In State ex rel. v. Cunningham, 100 Mo. 388, the rule was thus stated by Black, J.: "A juror who states on his examination that he has formed and expressed an opinion as to the guilt or innocence of the accused, and that opinion has been formed from rumor or newspaper reports, and that it would require evidence to remove the opinion, is not an incompetent juror, provided it shall appear to the satisfaction of the court that such opinion will readily yield to the evidence in the case, and that the juror will determine the issues upon the evidence adduced in court free from bias. [State v. Walton, 74 Mo. 270, and cases cited; State v. Bryant, 93 Mo. 302.] This rule, so often asserted by this court, is in accord with that where it is said: The true doctrine is, that if a juror's conceptions are not fixed and settled nor warped by prejudice, but only such as would naturally spring from public rumor, or newspaper reports; and his mind is open to the impressions it may receive according to the law and testimony, he is not incompetent. [2 Graham & Wat. on New Trials, 378.] Now, the opinion of the juror in this case was based upon what he had read in the paper over a year before the trial, since which time he had not thought of the matter. There is but one question left, and that is, whether it appears the opinion thus formed is such as not to bias his mind in the

trial of the case. Does it appear that the opinion is one which will readily yield to the evidence? This question, it may be observed, in the first place, is to be tried by the trial court as a question of fact, and the finding of the trial court ought not to be disturbed unless it is clearly against the evidence. All doubts should be resolved in favor of the finding of the trial court. [McCarthy v. Railroad, 92 Mo. 536.]''

The same rule was announced by GANTT, J., in State v. Williamson, 106 Mo. 169.

In State v. Bauerle, 145 Mo. 1. c. 15, this court had this question before it, and speaking through GANTT, J., said; ''Only one juror was challenged and this brings us to a consideration of the first exception in the trial. It is charged that the court erred in excusing H. F. Kleinschmidt from the panel of forty. It is not insisted that the panel of forty finally obtained were not entirely qualified, but that the defendant was entitled to have Kleinschmidt retained on the panel. The juror was informed that the State expected to substantiate the charge in the indictment by circumstantial evidence, and was asked by the prosecuting attorney if his opinions were such as to preclude his finding the defendant guilty upon circumstantial evidence alone, in a case where the punishment would be death. He answered he was opposed to capital punishment on circumstantial evidence. Upon further examination and cross-examination he still asserted that he was opposed to capital punishment on circumstantial evidence, but there might be an exceptional case where he could do so, but as a general proposition he would not convict on that character of evidence. Being pressed to say that if the evidence convinced him of defendant's guilt beyond a reasonable doubt, whether he could or could not convict, he answered, 'Well, I believe I could, but I would have to admit it would take a great deal of it and would have to be very strong.' Upon this showing the court excused him. This juror

was in the presence of the court. It observed his manner, and probably living in the same county he was known to the judge, and a wise discretion was necessarily lodged with the judge in excusing him. Whether the juror stood indifferent between the State and the defendant was a fact which the court under our laws was required to determine and his finding will not be disturbed unless manifest error appears. [State v. Williamson, 106 Mo. 162.] We think the court very properly excused the juror, even from what appears to us. There is no reason why the State should have had the additional burden of satisfying all the whims of the juror."

So in civil cases there is no reason why a party litigant should have the additional burden of removing an admitted prejudice or bias in the mind of a juror, who admits that such prejudice would unconsciously affect his action.

The statute, section 3783, Revised Statutes 1899, prescribes, that in civil cases each party shall be entitled to challenge peremptorily three jurors. Section 3785 prescribes, "No witness or person summoned as a witness in a civil cause, and no person who has formed or expressed an opinion concerning the matter, or any material fact in controversy in any such cause, which may influence the judgment of such person, or who is of kin to either party in such cause within the fourth degree of consanguinity or affinity, shall be sworn as a juror in the same cause."

The statute does not speak of the bias or prejudice of a juror affecting his qualifications, because it is fundamental in our system of jurisprudence that a juror shall be free from bias or prejudice, and that the burden shall not be cast upon the parties litigant to first remove the bias or prejudice of the juror before, or in addition to, proving the facts in the case. The principle of the rule underlying the statute, and affording ground for challenge for cause, is the same

as underlies the doctrine in reference to bias or prejudice of the juror.

Counsel for plaintiff refer to Thompson in his work on Trials, section 100, where it is said: "Under modern practice the court acts as trier of all challenges. And the determination of questions of fact is final and not subject to review." Of this it is sufficient to say that such is not the rule in this State.

Counsel for plaintiff further refer to Thompson on Trials, section 115, where the doctrine is laid down as follows: "The sound and prevailing view is that a party cannot, on error or appeal, complain of a ruling of a trial court in overruling his challenge for cause, if it appear that, when the jury is completed, his peremptory challenges were not exhausted; since he might have excluded the obnoxious juror by a peremptory challenge, and therefore the error is to be deemed error without injury. For the same reason, if a court erroneously overrules a challenge for cause, and thereafter the challenging party excludes the obnoxious juror by a peremptory challenge, he cannot assign the ruling of the court for error, unless it appear that, before the jury were sworn, his quiver of peremptory challenges was exhausted; in which case there is room for the inference that the erroneous ruling of the court may have resulted in leaving upon the panel other obnoxious jurors whom the party might, but for the ruling, have excluded by peremptory challenge. Some courts, therefore, hold that it is enough, in such a juncture, to show that his peremptory challenges were exhausted before the jury was sworn. But others take what seems the better view, that it must also appear, not only that his peremptory challenges were exhausted, but that some objectionable person took his place on the jury, who otherwise would have been excluded by a peremptory challenge."

Counsel for plaintiff cite cases which hold that even where the trial court erred in overruling a chal-

lenge for cause, it must affirmatively appear by the record that the party had exhausted his peremptory challenges in order to successfully challenge the ruling of the court.

This doctrine is manifestly pregnant with difficulty, and would necessitate an extensive collateral inquiry precedent to the regular proceedings in a case, in order that it might appear that the aggrieved party had or had not exhausted his peremptory challenges, or had not been driven to the necessity of using some of his peremptory challenges to get rid of the alleged prejudiced juror, whom he had challenged for cause, and thereby been deprived of the opportunity of getting rid of other objectionable jurors, though less objectionable than the juror challenged for cause. Such a ruling imposes a burden upon the party aggrieved, which he ought not to be compelled to bear, and reverses the theory of our system of jurisprudence that error is prejudicial, unless the party in whose favor the error is committed, shows that it was harmless error. The rule stated by Thompson on Trials reverses this practice and imposes upon the party who points out and assigns the error, the further burden of showing affirmatively that he was prejudiced by the error. Under our statute each party is absolutely entitled to three peremptory challenges. The statute also gives parties litigant the right to challenge a juror for cause. If error appears in the ruling of the court on a challenge for cause that question should be decided wholly independent of any consideration of whether the party litigant had or had not exhausted his peremptory challenges. In other words, the statute provides for two classes of challenges, one for cause and the other peremptorily without assigning any cause. And in the determination of the question of the propriety of the ruling upon a challenge for cause, it is improper to mix with it a consideration of the

question as to whether or not the complaining party had exhausted his peremptory challenges.

In Billmeyer v. Transit Co., 108 Mo. App. 6, it appeared that one of the jurors was challenged for cause. On his *voir dire,* the juror stated that he had a prejudice against the defendant because it had come near killing two of the members of his family. But that such prejudice would not affect him in the trial of the case and he thought he could give the defendant a fair trial. Yet that he had some hard feeling against the company on that account and he thought he had a right to have such a feeling; and that if he was selected as a juror, whilst, he would not allow his feelings to interfere with his verdict, still he could not get over that feeling, and that it would require the defendant to make a stronger defense than if the defendant were some other company. The trial court overruled the challenge for cause, and the Court of Appeals reversed the judgment for that reason alone. The opinion of the court was rendered by GOODE, J., and is one of the best and clearest considered cases bearing upon this subject to be found in the books. The learned judge in disposing of the case said:

"That testimony disclosed a very strong bias in the mind of the venireman; not exactly a prejudice in the strict sense of that word; for he had not prejudged the particular case, nor formed an opinion about it. Yet it is plain that he cherished a bitter and resentful feeling against the defendant which would be apt to prevent a dispassionate consideration of the case. It is true the juror swore he did not think his feelings would affect his judgment and that he could give the defendant a fair trial. But his entire testimony produces the conviction that his conception of a trial which would be fair to the defendant, embraced the notion that it would be incumbent on defendant to clear itself of blame for the accident by stronger evidence than other defendants, in similar actions, ought

to adduce. Such an opinion indicated a spirit of positive hostility that rendered the venireman unfit to perform the duties of a juror. The defendant certainly could not expect, nor likely receive, a fair trial by a man who would refuse to exonerate it from liability unless it made good its defense by an extraordinary weight of evidence—by more evidence than would be needed to induce him to excuse some other defendant.

"We have not found the decisions plentiful on the precise question of what bias against a party to a suit will disqualify a venireman; but the whole spirit of Anglo-Saxon jurisprudence is that causes shall be tried by men who are free from partiality or bias for or against the litigants; which indeed is the essence of a trial, properly so-called; for everyone knows how much a feeling of sympathy or aversion will influence the mind in coming to a conclusion on given facts. The rule of Lord MANSFIELD, a judge peculiarly attentive to the composition of his juries and their selection by the summoning officers, was that 'a juror should be as white as paper and know neither plaintiff nor defendant, but judge of the issue merely as an abstract proposition upon the evidence produced before him. He should be superior even to a suspicion of partiality.' It has been said that this rigor of qualification is now relaxed because of the difficulty in procuring such men when the news of events is generally spread by the press and that the prevalent test is the one stated by Chief Justice MARSHALL in Burr's case: 'That light impressions which may fairly be supposed to yield to the testimony that may be offered, which may leave the mind open to a fair consideration of that testimony, constitute no sufficient objection to a juror; but that those strong and deep impressions, which will close the mind against the testimony that may be offered in the opposition to them, which will combat that testimony and resist its force, do constitute a sufficient objection to him.' [Thompson & Merriam, Juries, sec. 207.]

The standards of those wise judges are not very different; for it will be observed that Lord MANSFIELD was less solicitous that the case should be wholly new to the jurors, than that they should come to the trial of it in a perfectly unbiased temper; and so it was with Chief Justice MARSHALL.

"The juror challenged in the court below was not in a mood that left his mind open to a fair consideration of the defendant's testimony and hence was disqualified by Judge MARSHALL's standard. In State v. Bauerle, 145 Mo. 1, 46 S. W. 609, the State's challenge for cause of a venireman who was opposed to capital punishment on circumstantial evidence, was allowed, and the ruling was approved by the Supreme Court, although the venireman swore he believed he could convict the defendant on such evidence, if his guilt was established beyond a reasonable doubt; but that 'it would take a great deal of it (i. e., circumstantial evidence), and it would have to be very strong.' That man's bias was like the bias of the juror challenged in this case, in that both were in a temper to resist the effect of the evidence they would have to weigh. Of course, an appellate court more readily sustains than reverses the ruling of a trial court on such a question, which is one largely of discretionary action. But the decision of a case by jurors not inspired by animosity against one of the litigants is so important in the administration of justice, that when a venireman is challenged on his own confession of ill will towards one of the parties, deep-seated enough to prevent him from returning a verdict for such party on proof that would satisfy him were some one else concerned, we feel justified in saying it was error to overrule the challenge. [McCarthy v. Railroad, 92 Mo. 536; State ex rel. v. Bank, 10 Mo. App. 482, 80 Mo. 626.]"

The ruling announced in that case is so clearly just and equitable, and accords so nicely with the American

idea of jurisprudence, that it is not necessary to consider the decisions of other states. The streams of justice should be kept pure and free from prejudice. In the administration of justice, the courts and all judges, as well as the jurors, should, as far as human precaution can avail, be kept free from bias or prejudice.

The statutes of this State authorize a change of venue in civil cases, where either party, by *ex parte* affidavit, charges bias or prejudice of the judge. These statutes exemplify the policy of the law, which is intended to guarantee an absolutely free and fair trial. In the nature of the things it is impossible that like provisions should be made to secure unprejudiced jurors. In lieu of them the law has provided that the question of bias or prejudice of a juror shall be developed and determined on his *voir dire*. Of what avail is it to a litigant, if, when such examination develops the fact that a prejudice or bias exists in the mind of a juror, such as will influence, or tend to influence, his verdict, or such as will require evidence to remove, or such as will put either party to the necessity of producing stronger or better evidence than would be required if the suit was between persons as to whom the juror had no such bias or prejudice, the court permitted the question of fitness of the juror to be determined by the juror, himself, declaring that he would be able to accomplish the almost human impossibility of fairly and impartially deciding the facts, notwithstanding the bias or prejudice he admitted existed in his mind?

The juror Bensberg in this case candidly stated what every unbiased mind must know is the truth, that such a prejudice would unconsciously affect the verdict.

The administration of justice has not yet fallen so low, nor the character of our people become so imbued with prejudice, that it is impossible to secure a jury

that will enter upon the discharge of its duties with minds perfectly free to see and declare the right as the facts of the case show it to be, untinctured and untainted by the personal whims, bias or prejudice of the jurors. Such an argument finds support only in the doctrine of *ab inconvenienti*, and is wholly destitute of support in legal principles or in the policy of the law.

The conclusion is irresistible that the trial court should have sustained the challenge for cause.

## II.

The next error assigned is the action of the trial court in overruling the demurrers to the evidence.

It will be remembered that the negligence of the defendant charged in the petition was, first, failing to sound the bell or warn the deceased of the approach of the car; second, failing to keep a vigilant watch for vehicles on the track in front of the car; third, failing to stop the car after the danger became apparent, or by the exercise of ordinary care, would become apparent, and fourth, by running at a high rate of speed.

The case made is this: The deceased was driving a lumber wagon which was a mere skeleton wagon with no bed on it. Prior to the accident he was last seen at the World's Fair grounds, the exact point not being disclosed. The accident occurred at a point about one hundred and fifty feet west of Union avenue on De Giverville. It does not appear how far the deceased had driven on the railroad tracks on De Giverville avenue, going eastwardly, before the accident, but the presumption is a legitimate one from all the testimony in the case, that he had done so for several blocks. The accident occurred about 6:15 p. m. on January 20, 1903. The night was dark—some of the witnesses say it was very dark. There is no certain testimony from persons qualified to speak as to the rate of speed of the car. The testimony on behalf of the plaintiff in this regard was given by the three Kuhnes, two of whom

were on the front platform of the car, and one on the inside thereof, and by one Dunn. There was no attempt to have any of them qualify as experts, or as competent to give a reliable opinion as to the rate of speed of the car. Dunn was a laborer. He said the car was going "hard," but he did not know how fast. Gus Kuhne, eighteen years old, who worked for the Koken Barber Supply Co., said the car "was going good speed," but how fast he did not know. Otto Kuhne was a musician, and said he estimated the speed of the car to be about fifteen miles an hour; "I think something like that." Edward Kuhne, twenty-four years old, said the car was going "at a good rate of speed" which he estimated at fifteen miles an hour.

On the other hand, the motorman testified that the car was running eight or ten miles an hour. Carroll, a time keeper at the World's Fair, testified that it had been going at a very rapid speed, but that five hundred yards west of Union avenue it slowed down to about one-third of the speed it had been running, he could not estimate the speed in miles, on account of approaching the curve at Union avenue.

Thus the maximum of speed testified to by anyone was fifteen miles an hour, and the minimum speed, eight miles an hour. There was a double track on De Giverville avenue. Between the rails of the street car track and the curb of the street there was a space of twelve feet. The street was not an improved street, and was somewhat rough, but was in condition for travel. And its condition near Union avenue was better outside of the tracks than it was further west. There were no street lights on De Giverville avenue. There was one street light at the corner of De Giverville and Union avenue, which was one hundred and fifty feet east of the place of the accident. The car was well lighted with electricity, and had a head light burning. There were five persons on the front platform of the car, to-wit, Gus Kuhne, and his brother Ed

Kuhne, the motorman, R. A. Lindsay and John Boatright. The Kuhnes were joking and talking with each other and not looking towards the front. Boatright stood immediately behind the motorman and was looking towards the front. Just before the collision—there is a conflict as to how long, the Kuhnes saying it was immediately before, and the motorman saying it was a little while previous thereto—the conductor opened the front door of the car and asked the passengers if they wanted transfers, and upon receiving affirmative answers, the conductor retired to the inside of the car, presumably to prepare the transfers. The motorman turned and shut the door, which the conductor had left open. Immediately upon resuming his position, he began to vigorously apply the brakes and reverse the current. The motorman says it was because he, for the first time, discovered the wagon, driven by the deceased, a boy of nineteen years of age, within fifteen feet of the car. Boatright says that although he was looking towards the front, he did not see the wagon until the car was within twenty feet of it, when the motorman began to apply the brakes and reverse the current. Both say it was owing to the darkness of the night that the presence of the wagon was not discovered sooner. Lindsay says he saw the wagon first when the car was within a car length or a car length and a half of it.

There is no evidence that any of the appliances or machinery were improper appliances, or that they were out of repair, or that they failed to do their duty, nor that the motorman as soon as he discovered the wagon on the track, did not use every means in his power to stop the car in time to avert the collision, but was unable to do so. The car struck the end of the coupling pole which projected some feet behind the wagon, shoved the wagon along, knocked one of the horses down, and the deceased was thrown from the wagon

and killed, but was not run over by the car. The wagon was not injured in the least.

The theory of the plaintiff's case as expressed in the three instructions given for the plaintiff, is that it was the duty of the motorman, while his car was moving forward "to keep a constant and vigilant watch ahead, and that if such failure on his part directly contributed to, and was the direct and proximate cause of the death of the deceased," the verdict should be for the plaintiff. And further that the car was running at a dangerous rate of speed and that no gong was sounded or warning given of the approach of the car.

The rate of speed, whether it was fifteen miles an hour or eight miles an hour, was not in itself a dangerous speed, nor is there any evidence that it was negligence to run at that rate of speed at the place where the accident occurred, it being the western part of the city over an unimproved street. There is, therefore, nothing in this case which would justify a verdict for the plaintiff because of the dangerous speed of the car.

The place of the accident was one hundred and fifty feet west of Union avenue, and there is nothing in the testimony which tends even to cast a duty upon the defendant to sound a gong at that point, it not being an intersecting street and the presence of the wagon on the street not being known. The argument of the plaintiff, however, is that the defendant should have known or anticipated that persons would likely be traveling on De Giverville avenue at that time of the evening, returning from the World's Fair to the city, and hence it was the duty of the defendant to sound the gong, and warn persons so traveling over the street of the approach of the car. But it was equally the duty of persons passing over the street, and while driving on the street car tracks, to know that street cars were constantly passing over the same, and take proper precautions to get off of the track in time to avoid a collision. There is a conflict in the testimony

as to whether any warning was given or not. Dunn, who was a passenger on the rear platform, said he didn't hear any bell rung. Gus Kuhne said no bell was rung just prior to the accident. Otto Kuhne, who was on the inside of the car, said he heard no bell rung just prior to the collision. Ed Kuhne, who was on the front platform, said there was no gong rung just prior to the accident. On the other hand, the motorman testified that he had rung the bell "all along," and Boatright testified that the gong was sounded quite often before the collision. Lindsay testified that after the car left Forsythe Junction until the collision, the motorman "kept up a tattoo with his gong there all the way in."

The chief point relied on by the plaintiff is that it was the duty of the motorman, under the circumstances, to keep a constant and vigilant watch ahead to discover persons on the tracks, and to stop the car as soon as he saw, or by exercise of ordinary care, might have seen, the danger of the plaintiff, and that he was guilty of a breach of this duty because he turned his attention from the front long enough to close the front door of the car.

This is the chief, if not the only, act of negligence claimed in this case. There is, however, no evidence in the case that if the motorman had been constantly and vigilantly, as the plaintiff claims is his duty, looking ahead on the track, he would have been able to discover the presence of the wagon on the track any sooner than he did, or in time to avert the collision. The only witness who testified that he was looking ahead all the time was Boatright and he said that he did not discover the wagon on the track until after the motorman had closed the door and resumed his position at the brakes, and was beginning to apply the brakes and reverse the power. The two Kuhnes, who were on the front platform, testified that they were not

looking ahead, but were joking and talking with each other, and they did not see the wagon. There is, therefore, no testimony in the case that the act of the motorman in momentarily ceasing to keep a watch ahead and in closing the door, was the direct and proximate cause of the injury, nor that the motorman would have seen or could have seen the wagon any sooner than he did. The night was dark—some of the witnesses say very dark. The wagon had no light on it, and could not easily have been seen. Unless, therefore, the court or the jury, would be justified in assuming that the motorman, by the exercise of ordinary care, could have seen the wagon before he got within twenty-five feet of it, there is nothing upon which to base a liability of the defendant in this respect.

It is hard to draw a material difference between this case and the case of McGauley v. Transit Co., 179 Mo. 583. That, too, was a rear-end collision between a lumber wagon, with no bed on it, and in all respects like the wagon in this case, and a street car, both going in the same direction on the car tracks, at a point where there were no cross streets. There, as here, the night was dark, and the motorman testified that he did not and could not discover the presence of the wagon on the tracks until he got within fifteen feet of it; and that he immediately applied the brakes, but was unable to stop the car in time to prevent the injury. There, as here, the plaintiff contended and the court instructed, that the defendant was liable if the motorman failed to ring the bell or give a warning of the approach of the car. In that case it was claimed that the brakes were out of repair, but for which the car would have been more quickly stopped. In that case the street outside of the car tracks was macadamized, while here it was unimproved. In that case the plaintiff testified that he heard a noise behind him and tried to turn out of the track to get out of the way of the car, but did not succeed in doing so. In that case the motorman admitted

that he did not sound his gong because he did not see the wagon until he was so close to it that he had not time to sound the gong and also apply the brakes and reverse the current, and that the latter was the more effective means of preventing the accident. The jury found for the defendant in that case, the court granted a new trial, the defendant appealed, and this court reversed the order granting the new trial, and remanded the cause, with directions to overrule the motion.

This court, speaking through VALLIANT, J., disposed of that case as follows:

"That the plaintiff was guilty of negligence directly contributing to cause the accident appears from his own testimony. He was not a trespasser on defendant's track; the track was laid in a public street and therefore he had a right to drive his wagon along it. But in going upon the track he chose the more dangerous part of the street; he could with more safety to himself have driven along the west side of the street, outside the railroad, which the evidence shows was macadamized and adapted for travel. His duty to himself was to use ordinary care to avoid injury, and when he selected the more dangerous part of the street for his use, his care should have been commensurate with the greater danger thus assumed. He knew—the law compelled him to know—that cars were liable to come towards his wagon from behind, and he should have been on the lookout for them, he should have looked in the direction from which he knew they were liable to come. It was dark, there were no street lights there, and that fact should have made him more cautious. There were no street crossings there—it was in the suburbs—and the sounding of the street car gong which is usual at street crossings in the day was not to be expected there. There was an electric headlight on the dash board of the car, which, although there was some effort in the plaintiff's evidence to show was not very bright, could have been seen ac-

cording to his own testimony for 'a block or so.' Under these conditions the plaintiff drove along the track for a distance estimated at three blocks to a quarter of a mile without turning to look in the direction from which he knew a car was liable to come. He only looked back when he heard the car close to him. If he had looked back when the car was a block away he would have seen the headlight, and could easily have driven out of danger. Even with the car as close as it was when he did look he says himself that he succeeded in getting his wagon all clear of the track except the long end of the coupling pole.

"Granting that the motorman was negligent in not sounding his gong—that the defendant was negligent in allowing the car to be in use without a safe brake—that those facts contributed to the catastrophe —still the accident would easily have been avoided if the plaintiff had taken care to look for the car which he knew was liable to come and seeing it had driven out of the track.

"It is doubtful if the evidence shows any negligence on the part of the defendant. The motorman was not an unfriendly witness to the plaintiff. He had been discharged by the defendant and had been on very pleasant relations with the plaintiff ever since his discharge. We do not mean to imply that he was not truthful in his testimony, but only to say that he was not reluctant to tell anything he knew that would benefit the plaintiff's case. He said he did not sound his gong, because he did not see anything on the track until he was so close to the wagon that he could do nothing to avert the collision. This was a wagon not easily seen in the dark; it had no body, was composed of only the wheels and gearing and was rather of skeleton form. We cannot say as a matter of law that the motorman was negligent in not seeing it and therefore in not sounding the gong to warn the driver to move off the track. There was no evidence that the motorman was

not looking ahead. He testified that the brake was in bad condition, but when he was required to specify the defect, his testimony was to the effect only that it was so worn that it required two and a half more turns of the rod to set it than it would require if in perfect order. The plaintiff not being in the attitude of a passenger, the defendant owed him the duty only to have a reasonably safe appliance. There was no testimony that the brake even as described by this witness was not reasonably safe.

"Respondent contends that the case should have been given to the jury on the theory of his second instruction which the court refused, that is, that the plaintiff was entitled to recover notwithstanding his own negligence.

"There is nothing in this case to bring it within the doctrine of Kellny v. Railroad, 101 Mo. 67; Morgan v. Railroad, 159 Mo. 262; Klockenbrink v. Railroad, 172 Mo. 678.

"There is no evidence tending to show that with a brake in perfect repair this car could have been stopped in time to avert the accident after the motorman saw the wagon; there is no evidence tending to show that the motorman was not on the lookout, or that he could by the exercise of ordinary care have seen the wagon before he did see it. Plaintiff's own evidence shows that the motorman did everything in his power, after he saw the danger, to prevent the collision. In no view of the evidence was the plaintiff entitled to recover."

In all essential legal principles there is no difference between the McGauley case and the case at bar. For whilst in the McGauley case the motorman said that he was looking ahead, still he said that the brake was in bad condition. In both cases the danger of the driver of the wagon was not discovered until the car was within fifteen or twenty-five feet of the wagon. In this case there is no evidence that there was any defect

in the machinery or appliance for stopping the car.
And whilst in this case, the motorman momentarily
ceased to look ahead while he shut the door, still there
is no evidence that he could have seen the wagon any
sooner than he did if he had been looking forward and
had not ceased so to do while shutting the door. In
fact it appears that the motorman was the first one to
discover the presence of the wagon and began to set
the brakes and reverse the current even before Boat-
right, who was looking forward all the time, saw the
wagon on the track. Upon the whole case, therefore,
there was nothing upon which to predicate a liability
of the defendant and the demurrers to the evidence
should have been sustained.

### III.

At the request of the plaintiff, the court instruct-
ed the jury as follows:

"3. You are further instructed that it was the
duty of the motorman of the car, while his car was
moving forward, to keep a constant and vigilant watch
on the track ahead; if you believe from the evidence
that the motorman failed to keep such a watch; and
that such failure on his part directly contributed to,
and was the direct and proximate cause of the death of
the deceased, your verdict must be for the plaintiff,
provided, you further find that at the time of the colli-
sion, and immediately preceding same, the deceased
was in the exercise of ordinary care."

This is assigned as error. This is a common law
action of negligence and not one arising under any
ordinance or statute. The deceased was not a passen-
ger on the car, neither was he a trespasser on the track,
therefore, the obligation of the defendant was to use
ordinary care to prevent injuring him; and the corre-
lative duty of the deceased was to use ordinary care
to avoid being injured. There is no element of wilful-
ness or wantonness in this case, and, therefore, the

humanitarian doctrine has no application. The instruction complained of required the motorman "to keep a constant and vigilant watch on the track ahead." This is not a correct definition of the common law duty of the motorman. The instruction should read, that it was the duty of the motorman to exercise ordinary care to avoid injuring the deceased. Ordinary care was properly defined in instruction No. 5 given for the plaintiff, to mean, "that degree of care which a person of ordinary prudence in the same occupation would use under the same or similar circumstances, as those shown in the evidence." Ordinary care might or might not require the motorman to be looking ahead on the track. But there is a vital difference between the requirements of ordinary care and the duties imposed by this instruction "to keep a constant and vigilant watch on the track ahead."

A vigilant watch means, in the common acceptation of the term, an exceedingly careful watch. At any rate, the use of that term is well calculated to cause the jury to believe that the court intended to impose a stricter duty on the defendant than was ordinarily required. Yet the defendant's duty in this case was to exercise ordinary care. The meaning of the court in this respect is emphasized by its refusal to give the 7th instruction asked by the defendant, which was as follows:

"If you find by reason of the darkness and character of the vehicle, the motorman, by keeping a vigilant watch, was unable to see the wagon until he was so close to the same that by using the instrumentality at his command, he was unable to stop the car and thus avoid the collision, and that as soon as he saw the same, he used every, and the most effective means of stopping the car, and failed so to do, then the defendant is not liable and you will so find."

It will be observed that the defendant also employed in its instruction the term vigilant watch, yet

the court refused to give that instruction, and gave instruction No. 3 above quoted for the plaintiff. The only reason that can be conceived for the action of the court in this behalf, is that the court must have thought that the act of the motorman in momentarily withdrawing his watch from the track while he closed the front door of the car, justified a verdict for the plaintiff, and that therefore instruction No. 7 asked by the defendant was improper because of this temporary withdrawal by the motorman of his watch ahead of the track.

But such a view is untenable, for instruction No. 7 put the case to the jury upon the predicate that if the motorman had been keeping a vigilant watch ahead on the track, he would not have been able sooner to discover the wagon on the track by reason of the darkness and the character of the wagon. This view of the case the defendant was certainly entitled to have go to the jury and no other instruction covered it. On the contrary, the only other instruction given was instruction No. 3, which required the motorman to keep a constant and vigilant watch on the track ahead, and it may have been argued before the jury, as it is strongly argued here, that it was the duty of the motorman to keep a constant and vigilant watch. In support of this contention plaintiff refers to an instruction given in the case of Heinzle v. Railroad, 182 Mo. 528, which required the motorman to keep a constant lookout on the track. Of that instruction, however, it is only necessary to say that no objection was made by the defendant to the use of the word "constant," and therefore the correctness thereof was not passed upon by this court.

This being an action under the common law it was improper to instruct the jury as the court did in plaintiff's instruction No. 3. Instead of telling the jury that it was the duty of the motorman "to keep a constant and vigilant watch on the track ahead," the court

should have instructed the jury that it was the duty of the motorman to exercise ordinary care to prevent a collision with or injury to the deceased. Such an instruction, coupled with one which defined what constitutes ordinary care, would have left the matter to the jury to determine whether, under the facts and circumstances, the motorman had or had not acted with that degree of care which a person of ordinary prudence would have exercised, under the same or similar circumstances.

For the foregoing reasons the judgment of the circuit court is reversed.

*Brace, P. J.,* concurs; *Valliant* and *Lamm, JJ.,* concur in paragraphs 1 and 2, and in the result.