Ollie **RAY, et al., Respondents,**

v.

**Marvin C. GREAM, Jr., et al., Appellants.**

No. 75499.

Supreme Court of Missouri,
En Banc.

Aug. 17, 1993.

---

**4.** *§ 303.190.5.*

Lawrence H. Rost, New Madrid, for appellants.

W. Edward Reeves, Caruthersville, Charles Sampson Williams, Kennett, for respondents.

LIMBAUGH, Judge.

This is an appeal in a will contest case. The trial court entered judgment upon a jury verdict in favor of plaintiffs, the contestants of the will of Myrtle F. Peterson. Defendants, the proponents of the will, appealed to the Missouri Court of Appeals, Southern District, which reversed the judgment on the ground that the trial judge erred in failing to strike from the venire certain prospective jurors who the proponents challenged for cause. Having reviewed that issue on transfer from the Court of Appeals, we determine that there was no error, and we affirm the judgment of the trial court.

Mrs. Peterson, widowed and childless, died on September 15, 1990, at age 79. Proponents of the will are two brothers, Marvin C. Gream, Jr. and Ronnie Lee Gream, who were not related to Mrs. Peterson. The Gream brothers, however, were longtime neighbors and friends with Mrs. Peterson. They farmed approximately 2,200 acres in the Missouri Bootheel, including a 140 acre tract that they had rented from Mrs. Peterson since about 1970. Contestants of the will, on the other hand, are Mrs. Peterson's two half brothers and a half sister.

On April 22, 1990, Mrs. Peterson was severely injured in an automobile accident that left her paralyzed from the neck down, and as a result of that injury, she was hospital-

ized until her death. During that time, she executed a power of attorney in favor of Marvin Gream so that he could handle her financial affairs while she was incapacitated. Subsequently, Mr. Gream, a nonlawyer, prepared a will for Mrs. Peterson by using his own will as a model. This was done apparently at Mrs. Peterson's request. Though paralyzed, she then, with the assistance of Mr. Gream, placed a "x" on the signature line. Two witnesses to the purported execution of the will signed the will while all were present. Adjacent to the "x" mark, Mr. Gream then wrote "Myrtle F. Peterson, Marvin C. Gream, Jr., Power of Attorney."

Under the terms of the will, Mrs. Peterson devised her 140 acre farm to the proponents, the Gream brothers, and she bequeathed her remaining property to the contestants, her half brothers and half sister. After the will was admitted to probate, this action was commenced. The allegations of contestants' petition included failure to comply with statutory requirements for the execution of wills as well as fraud and lack of testamentary capacity.

The proponents' sole point on appeal is that the trial judge erred by denying their challenges for cause against six members of the jury panel "who stated a clear and unequivocal bias against a person outside the family who is left property by a decedent." The more particular issue, as we see it, concerns the propriety and effect of efforts to rehabilitate those prospective jurors.

Because the dialogue at voir dire between the judge, the counsel, and the prospective jurors is critical to a resolution of the issue presented, we quote extensively from the record. The pertinent exchange began when counsel for the will proponents asked whether "anyone [has] any preconceived notion or otherwise about leaving property to someone outside your family?" In response to that question, the voir dire continued as follows:

MARY ANN SANDERS: Mary Ann Sanders. Are you trying to say that—do we think it's not right?

MR. ROST [proponents' attorney]: Yes. I'm saying if there was somebody that somebody in your family left property to and it wasn't a family member, would that be okay?

MARY ANN SANDERS: No. I've always been against that.

MR. ROST: So if the case—if the facts are such in this lawsuit that it develops a non-family member was left, in this case a farm, that you would be in a position to render a fair—

MARY ANN SANDERS: No.

MR. ROST: —verdict—

MARY ANN SANDERS: No, I wouldn't.

MR. ROST: —fair decision?

MARY ANN SANDERS: Huh-uh.

\* \* \* \* \* \*

MR. ROST: Anybody else have any problem like Ms. Sanders? We appreciate your honesty, Ms. Sanders. That's what we want to do. We want to make sure people can serve on this jury without having any problem with—in trying to make a decision.

LOIS TANNER: My name's Lois Tanner and I would be for the family.

MR. ROST: Yes.

LOIS TANNER: We are pretty—Well, I'd want what I have to go to somebody in my family.

THE COURT: Lei Ann, could you hear that? I really couldn't hear your answer.

LOIS TANNER: My name is Lois Tanner. And if this was my situation, I would want what I would leave to go to a member of my family regardless if there wasn't children. I wouldn't want it to go otherwise.

THE COURT: Okay.

MR. ROST: Well, would that feeling that you've just stated, would it cause you to be uncomfortable in sitting on this jury today?

LOIS TANNER: Well, I think so.

MR. ROST: Could you not render a fair decision in this matter because of that notion?

LOIS TANNER: Not really. I don't know. But that's my feelings. If I—

someone were to have something, I think it should go to a member of a family.

\* \* \* \* \* \*

SHERRY RILEY: Sherry Riley. I think it should go to the family, too.

MR. ROST: Well, I'll ask you the same questions I asked Ms. Tanner and also Ms. Sanders: Could you serve on this jury and render a fair and impartial decision if the property was left to somebody besides a family member?

SHERRY RILEY: I don't think so. I would—In my opinion I think it should go to the family regardless.

MR. ROST: You could not be impartial?

SHERRY RILEY: I guess I could.

THE COURT: Well, you think you can be impartial or you can't be?

SHERRY RILEY: No, no. I think I'd still vote it goes to the family.

MR. ROST: All right. So there would be a partiality?

SHERRY RILEY: Yes.

MR. ROST: You are then biased in favor of the family member?

SHERRY RILEY: Yes.

\* \* \* \* \* \*

HARVEY PRINCE: Harvey Prince. I think everything ought to be to family there myself, too.

MR. ROST: You're Mr. Prince, aren't you?

HARVEY PRINCE: Right.

MR. ROST: And you think that everything should go to the family member regardless?

HARVEY PRINCE: Yes, sir, sure do. I feel they'd be more entitled to it than some outsider would.

MR. ROST: Under all circumstances?

HARVEY PRINCE: Yes, sir.

MR. ROST: So would you say then that it would be very difficult for you to listen to the testimony and to the witnesses today and then render a fair verdict or fair decision?

HARVEY PRINCE: I believe I'd have to lean toward the family mostly.

MR. ROST: You think you would be partial toward the family?

HARVEY PRINCE: Yes, sir.

MR. ROST: You could not be impartial? You could not be without this notion and bias toward the family?

HARVEY PRINCE: I don't think so.

MR. ROST: Thank you, sir. Yes, sir.

DARRELL ROBERTS: Darrell Roberts.

MR. ROST: Yes, Mr. Roberts.

DARRELL ROBERTS: Did you not ask do we have a preconceived notion about this?

MR. ROST: Preconceived, any type of notion.

DARRELL ROBERTS: Well, I have to be honest and say that I just feel things should go to the family because of past things that have happened in my family. And you asked me the question could I be fair I'd like to say I could be. In making a judgment, if I were chosen to be on the jury, I think I would take the evidence and think of it. But I still have that preconceived notion. I have to be honest.

MR. ROST: Would you—then you would start this trial with a notion leaning towards the family?

DARRELL ROBERTS: Yes, sir.

MR. ROST: And we would, "we" being the defendants, would have to overcome that; would we not?

DARRELL ROBERTS: Yes, sir.

MR. ROST: So in effect, you might— you might lean toward the family? If that's the case, you could end up being partial to the family?

DARRELL ROBERTS: Yes, sir. I'm sorry but that's ...

MR. ROST: Yes, sir. Mr. Pujol.

HENRY PUJOL: Don Pujol. I'd have to go the same way Mr. Roberts went on that. The way he stated is just the way I feel about it.

MR. ROST: I have to ask the same questions I asked Mr. Roberts.

HENRY PUJOL: All right.

MR. ROST: When we start this trial you're already—

HENRY PUJOL: I'm already in favor—

MR. ROST: —in favor of—

HENRY PUJOL: —of the family.

MR. ROST: —the family?

HENRY PUJOL: So you have to overcome that, you know.

MR. ROST: And it would be difficult for you to listen to the evidence?

HENRY PUJOL: Oh, I could listen to the evidence. And I don't know. I'm not saying—You have to overcome that, though.

MR. ROST: So you have this bias starting out?

HENRY PUJOL: (Nods head.)

MR. ROST: And that would influence your decision?

HENRY PUJOL: (Witness nods head.)

MR. ROST: And you could not be impartial?

HENRY PUJOL: Well, not totally impartial.

MR. ROST: Thank you. Yes, ma'am. Ms. Richards.

TRUDY RICHARDS: Trudy Richards. You were talking about preconceived notions—

MR. ROST: Yes, ma'am.

TRUDY RICHARDS: —and bias?

MR. ROST: Right.

TRUDY RICHARDS: To begin with, I would probably lean more toward the family. But if it could be presented, you know, where I could understand why someone would leave property to people outside their family, I could go with that. But something that Mr. Williams said about the Greams going to the hospital with their power of attorney and their will, that struck me as wrong.

MR. ROST: Of course, what Mr. Williams has said—is not evidence in this case.

TRUDY RICHARDS: Yes, I know this.

MR. ROST: Evidence in this case will come from the witnesses. Statements that he has made and statements that I made are not evidence, and you understand that you have to listen to the witnesses.

TRUDY RICHARDS: I realize that. But that did put a preconceived notion in my mind.

MR. ROST: Would that make it very difficult for you to serve on this jury?

TRUDY RICHARDS: I think it would have some influence on whether I could or not.

MR. ROST: I'll hit you with the $64,000 question: Could you render an impartial decision?

TRUDY RICHARDS: I would hope I could.

MR. ROST: You would hope. Let's— You know, we've got to rule out the hopes. We've got to say yes, I could or no, I couldn't. And if you had to say one or another, how would you say it?

TRUDY RICHARDS: I don't know. Probably so.

At this point, the trial judge began to question the prospective jurors, and the following exchanges took place:

THE COURT: Let me kind of—We've worked ourselves into a box here and we're getting deeper and deeper. The Court, during the course of this trial today, will instruct each of the jurors as to the law as it pertains to this case. And the attorneys have asked you about preconceived thoughts. And, of course, all of us have preconceived thoughts about a myriad of things especially concerning a situation like this. And it's only logical that you might have a preconceived thought.

As Mr. Rost said, the $64,000 question is if you were selected as a juror, could you follow the instructions of the Court concerning the law, set aside any lifetime experience you've had or preconceived thought and decide this evidence only from the evidence that you hear from the witness stand and apply that evidence to the law that the Court will give you to guide you in this case? Now, and we've had several people who have answered these questions that Mr. Rost got into, and let me just go down the list first real quick.

Ms. Tanner, you told me—Now, do you understand what I've told you here now?

LOIS TANNER: (Nods head.)

THE COURT: There's nothing wrong with having a preconceived thought. It's a problem when you tell me your preconceived thought is such that you cannot follow the law that the Court gives to you and listen to the evidence and make a fair and impartial decision as to each party. Is your preconceived thought such that you cannot make a fair and impartial decision in this case?

LOIS TANNER: No. After I heard both sides, I would hope I could make a fair—

THE COURT: Are you telling me—And I believe all the people have said, well, I believe what you have should go to your family. If you polled a large segment of the community that would be probably a random selection but would tell you—a certain amount would tell you they do believe that. But the law will tell you that it is not wrong to give something to somebody else. You're not bound to give what you have to your family.

LOIS TANNER: I understand that, too.

THE COURT: Keeping that in mind would you hear this evidence here today from the witness stand and follow the law that the Court gives you and make a fair and impartial decision as to both the plaintiffs and the defendants in this case?

LOIS TANNER: After hearing both sides, I would hope I could.

THE COURT: Okay. And Mrs. Riley, you also had the same response, similar response.

SHERRY RILEY: (Nods head.)

THE COURT: Could you follow the law the Court gives you and listen to the evidence and set aside your preconceived thoughts and make a fair and impartial decision in this case or could you not do that?

SHERRY RILEY: I think I could.

THE COURT: You think you could be a fair and impartial juror in this case?

SHERRY RILEY: (Nods head.)

THE COURT: That's a yes?

SHERRY RILEY: That's a yes.

THE COURT: For the court reporter. Okay. Mr. Prince?

HARVEY PRINCE: Yes, sir.

THE COURT: You also said you had a general thought yourself that things should go to the family. After you've heard what I've said about the law and you listened to the evidence in deciding the case solely on the evidence you hear here today and applying it to the law the Court gives you, could you be a fair and impartial juror or would your preconceived thoughts keep you from being an impartial juror?

HARVEY PRINCE: Yes, sir. I'd listen to the evidence and however the evidence went, that would be the way I'd go. But my feelings, I was asked how I felt about that.

THE COURT: I wanted to clear it up. We're kind of working ourselves into a box. You've told me you could be a fair and impartial juror to both the plaintiffs and the defendants here today—

HARVEY PRINCE: Yes, sir.

THE COURT: —is that correct?

HARVEY PRINCE: I can go with the evidence.

THE COURT: All right. Now, Mr. Pujol, you also told me a similar response. Could you follow the law and the instructions that the Court gives you and listen to the evidence and be a fair and impartial juror in this case—

HENRY PUJOL: Yeah, I could do that.

THE COURT: —as to all parties involved?

HENRY PUJOL: (Nods head.)

THE COURT: You have to say yes or no for the court reporter.

HENRY PUJOL: That's a yes.

THE COURT: And Ms. Richards, you said you could follow the law and the evidence; is that correct?

TRUDY RICHARDS: Yes.

THE COURT: And we've got Mr. Roberts back there on the back row. Now, you've told me about your preconceived thoughts and you've heard me now explain to you the law and the evidence. Could you set your preconceived thoughts aside

and follow the law that the Court gives you and the evidence that comes from this witness stand here today?

DARRELL ROBERTS: Yes, sir, I think I can. But I felt my responsibility to tell—

THE COURT: I appreciate your candor and the candor of all the other witnesses who have testified here today—jurors, rather.

Ms. Sanders, you gave a similar response. Now, me giving you a little more idea about the law and the evidence here today, are your preconceived thoughts such that you could not be an impartial juror?

MARY ANN SANDERS: I just don't think I could.

THE COURT: Okay That's fair enough. That's all I wanted to know.

\* \* \* \* \* \*

Following additional, unrelated questions, the panel was excused and the court took up the question of challenges for cause:

THE COURT: Gentlemen, do you have any requests for strikes for cause?

MR. ROST: Yes, Your Honor. We would ask the Court to strike for cause Mrs. Mary Ann Sanders. Upon your interrogation, she said unequivocally she could not.

THE COURT: She's Juror 22. Any objection, Mr. Williams?

MR. WILLIAMS [attorney for will contestants]: Your Honor, we would object. I believe that she could render a proper verdict, Your Honor, with your authoritarian voice giving the instructions.

THE COURT: She did equivocate. She said even she had such a preconceived thought she couldn't be a fair juror. I'll show her stricken for cause at the defendants' request.

MR. ROST: Your Honor, we're also going to make the same request with regard to all the people that had indicated following my interrogation that they could not render a fair and impartial decision. And those questions were specifically asked of them and they gave very specific and unequivocal answers. Now, I know they were rehabilitated after you talked with them and gave them the instructions on the law as it applies to the evidence, but I feel very strongly based on the statements that they made that we're going to have—I would have a problem as the defendant in trying to get a fair and impartial verdict out of those people, based on their testimony.

Thereafter, the court denied the challenges for cause against prospective jurors Tanner, Riley, Prince, Pujol, Richards, and Roberts. The proponents, the Gream brothers, used their peremptory strikes to remove Tanner, Riley and Prince, but Pujol and Richards served on the jury. Roberts, the remaining venireperson, did not make the panel of eighteen.

The statutory grounds applicable to the challenges for cause raised in this case are found in § 494.470, RSMo Supp.1992 that states:

1. .... [N]o person who has formed or expressed an opinion concerning the matter or any material fact in controversy in any case that may influence the judgment of such person ... shall be sworn as a juror in the same cause.

2. Persons whose opinions or beliefs preclude them from following the law as declared by the court in its instructions are ineligible to serve as jurors on that case.

 Our standards for reviewing rulings on challenges for cause are well established. Trial courts are given broad discretion to determine whether prospective jurors are qualified, and rulings on that issue "will not be disturbed on appeal unless [they] constitute] a clear abuse of discretion and a real probability of injury to the complaining party." *State v. Feltrop*, 803 S.W.2d 1, 7 (Mo. banc), *cert. denied*, —— U.S. ——, 111 S.Ct. 2918, 115 L.Ed.2d 1081 (1991); *State v. Walton*, 796 S.W.2d 374, 377 (Mo. banc 1990). Mindful that the trial court is in a better position to determine the qualifications of prospective jurors, doubts as to the trial court's findings will be resolved in its favor. *Walton*, 796 S.W.2d at 378. The critical question in reviewing the exercise of discretion is whether the challenged venirepersons

indicated unequivocally their ability to evaluate the evidence fairly and impartially. *Feltrop*, 803 S.W.2d at 7; *State v. Lingar*, 726 S.W.2d 728, 734 (Mo. banc 1987).

■ Applying these principles to the facts at hand, we hold that the trial court did not abuse its discretion by denying the challenges for cause. All of the prospective jurors who made the panel were successfully rehabilitated. Although those jurors initially indicated a bias in favor of the family members contesting the will and against the non-family members who were proponents of the will, the court found, after its independent inquiry, that the jurors could set aside any "preconceived notions" and judge the case fairly and impartially by the facts presented and the applicable law. The fact that some of the jurors used imprecise language such as "I think I could" or "I would hope I could" does not necessarily make their responses equivocal. These expressions, we have noted, are merely the vernacular to express affirmative responses. *State v. Griffin*, 756 S.W.2d 475, 481 (Mo. banc), *cert. denied* 490 U.S. 1113, 109 S.Ct. 3175, 104 L.Ed.2d 1036 (1989); *State v. Mercer*, 618 S.W.2d 1, 7 (Mo. banc), *cert. denied* 454 U.S. 933, 102 S.Ct. 432, 70 L.Ed.2d 240 (1981). We defer to the trial court's determination that the responses were not equivocal.

Proponents cite the venerable case of *Theobald v. St. Louis Transit Co.*, 191 Mo. 395, 90 S.W. 354 (1905), for two propositions:

1. It is an abuse of discretion to fail to strike a prospective juror who clearly admits bias even when the juror says that he or she can set aside that bias; and

2. It is improper for the judge to rely solely on the conclusions of the prospective jurors in determining whether they can be impartial.

In *Theobald*, a prospective juror had been injured in a streetcar accident eight or nine years before trial. During voir dire the juror indicated that he had nothing against the particular defendant, a streetcar company, but stated that he had entertained a prejudice against streetcar companies for all the years since his accident. Upon further examination, the juror concluded that he could be impartial despite his earlier experience.

In holding that the juror should have been stricken for cause, this Court stated:

Where a juror admits as Hartman [the prospective juror] did, that he had a prejudice against street car companies of eight or ten years' standing, and that that prejudice existed up to the time he gave his first answer upon his voir dire, yet, after being examined and cross-examined by counsel and the court, and being put in the position of having to say he would allow that prejudice to overcome the obligation of his oath as a juror, or, on the other hand, to say that he could divest his mind of such a prejudice and fairly try a case, and that the prejudice had become dissipated within the last five minutes, it can scarcely be reasonably said that such a juror fills the requirements of our system of jurisprudence.

*Theobald*, 90 S.W. at 359.

In what we believe is an expansive and unwarranted reading of this passage from *Theobald*, the proponents suggest that all prospective jurors who preliminarily admit to actual bias, as opposed to the mere possibility of bias, are irreversibly unfit for service and are not subject to rehabilitation. However, to glean from *Theobald* that all beliefs or opinions on a relevant issue must always result in disqualification would be to eliminate all persons for cause. As the trial court aptly observed in its examination of the prospective jurors, "all of us have preconceived thoughts about a myriad of things." Nevertheless, a distinction may be made between deep-seated and enduring bias that is often borne of a personal, specific and directly adverse experience—the kind of prejudice evidenced by the juror in *Theobald*—and a general opinion or belief that may be prejudicial in nature but moderate in degree—one that would not necessarily impact on a juror's ability to be impartial. In this regard, *Theobald* clarifies its holding in the following passage:

It is not every opinion of a juror concerning the matter in litigation which will operate as a disqualification. To have that effect it must be such an opinion as will influence his judgment in the consideration of the cause. ... Opinions formed, but not

of a fixed character, and which readily yield to evidence, do not disqualify the juror.

It is on these precepts, reaffirmed in cases as recent as *Feltrop*, 803 S.W.2d at 8, and *Griffin*, 756 S.W.2d at 481, that we have traditionally evaluated evidence of juror bias.[1]

The questions posed in this case and the degree of bias to which the prospective jurors initially admitted are more akin to the situation in *Beard v. Railway Express Agency, Inc.*, 323 S.W.2d 732 (Mo.1959). During voir dire in the *Beard* case, defendants' counsel asked the prospective jurors if they felt, "in your own mind that every employee who is injured while in the service of his employer should be entitled to some compensation regardless of the circumstances under which the accident occurred?" *Id.* at 737. In analyzing the responses of the several members of the jury panel who stated that the employee should be paid, this Court stated:

> In fact, we think the answers of these veniremen were generally those such as one would get severally from any group of intelligent laymen in answering questions restricted to quick personal views expressed without regard to the circumstances and law of a given case as these veniremen were restricted by the questioning counsel.

*Id.* The court disposed of the defense counsel's argument that the responses to his question indicated a disqualifying prejudice or bias, stating: "Any supposed implication that any venireman was of a 'deep-seated conscientious' belief that in all circumstances the employer should pay and regardless of any question of the employer's fault was self-drawn and injected by defendants' counsel in the course of his inquiry." *Id.* This Court held, therefore, that the trial judge had not abused his discretion in refusing to strike the prospective jurors for cause. *Id. See also Cleghorn v. Terminal R.R. Assoc. of St. Louis*, 289 S.W.2d 13 (Mo.1956); *Timmer-*

*man v. Terminal R.R. Assoc. of St. Louis*, 362 Mo. 280, 241 S.W.2d 477 (1951).

The effect of the proponents' questions in this case was to elicit a natural and not unexpected response from the members of the jury panel that property in their own family should not be left to someone outside of their family. Given only this hypothetical possibility without any elaboration about the actual facts of the case or the law applicable to the case, the affirmative responses of the jurors were not automatically disqualifying. Moreover, from a thorough review of the voir dire transcript, it is clear that none of the six prospective jurors in question demonstrated the degree of bias that would not "readily yield to evidence" and that would preclude rehabilitative efforts.

Contestants also cite *Theobald* in support of their argument that the trial court improperly relied on the jurors' conclusory statements that they could be impartial. *Theobald* states:

> The question of the qualification of a juror is a question to be decided by the court, and not one to be decided by a juror himself. It is the prerogative and duty of the trial court to exercise a wise, judicial discretion in this regard, and the conclusion of the court should rest upon the facts stated by the juror with reference to his state of mind, and should not be allowed to depend upon the conclusions of the juror as to whether or not he could or would divest himself of the prejudice he admitted existed in his mind. And this is true whether the prejudice exists against either of the parties or against the character of the subject-matter in litigation, or against either of the parties as a class, and not against the party as an individual. It is proper to examine a juror as to the nature, character, and cause of his prejudice or bias, but it is not proper to permit the juror, who admits the existence in his mind of such prejudice or bias, to determine

---

1. *See also State v. Debler*, 856 S.W.2d 641 (Mo. banc 1993), that distinguishes between the disqualifying bias of those who have formed an opinion on the material facts of the case, *see* § 494.470.1, and other types of bias that are merely "opinions about 'larger issues' "—opinions that all prospective jurors will have to some extent. Under § 494.470.2, that type of bias is disqualifying "only if [the prospective jurors'] views would preclude following the instructions given by the court." *Debler*, 856 S.W.2d at 645.

whether or not he càn or cannot, under his oath, render an impartial verdict. Such a course permits the juror to be the judge of his qualifications, instead of requiring the court to pass upon them as questions of fact.

*Theobald*, 90 S.W. at 359. According to the proponents, the case at bar is identical to *Theobald.* In each case, the only evidence of the jurors' ability to divest themselves of bias was their own conclusion to that effect, and therefore, the jurors were allowed to be the judges of their own qualifications. The proponents add that the only way to rehabilitate jurors who show actual prejudice is to elicit *facts* that would show that the "nature, character, and cause" of the bias are such that the bias can be set aside and the case judged impartially.

■ To address proponents' contentions, we first note that it is proper for the trial court to consider the juror's testimony concerning his or her ability to act impartially. *Walton,* 796 S.W.2d at 377–378; *State v. Reynolds,* 619 S.W.2d 741, 749 (Mo.1981). This idea is set out more fully in 47 Am. Jur.2d Jury § 210, where it is stated: "A juror's answers on voir dire to questions touching his state of mind are primary evidence of his competency. His testimony or opinion derived from his own consciousness is relevant, competent, and primary evidence on the issue of his indifference and impartiality."

The key point of *Theobald* is not that the court is prohibited from basing its determination on the opinions or conclusions of the jurors, but that the trial court must make an independent determination of the jurors' qualifications. That task is accomplished when the trial court reviews and evaluates the jurors' conclusions and weighs them against the earlier admissions of prejudice. It is in that sense that the requirement for an independent determination is not inconsistent with the court's reliance on those conclusions.

2. *See also State v. Lovell,* 506 S.W.2d 441 (Mo. banc 1974); *State v. Holliman,* 529 S.W.2d 932

■ In some cases, such as *Theobald,*[2] the initial indication that a juror is prejudiced may be so strong as to require more than the testimony that the prejudice can be set aside. In these instances, the opinion or conclusion of the jurors must be discounted, at least to some extent, and absent other evidence that the juror could in fact serve impartially, the challenge for cause should be sustained.

■ On the other hand, the self-assessment of prospective jurors that they can set aside their bias is, in most cases, sufficient evidence, in and of itself, to support the trial court's determination that the juror is not disqualified. For example, *Feltrop, Walton,* and *Lingar,* the sole evidence that jurors could overcome their previous indication of bias were their own conclusory statements to that effect. Indeed, reliance on such evidence is the common and long-accepted practice of our trial courts.

In sum, we hold that the jurors in question did not exhibit the degree of bias that would automatically disqualify them from serving and that the trial court appropriately considered the testimony of those jurors that they could set aside their stated bias and serve impartially. As stated earlier, the trial court's determination of the jurors' qualifications was not an abuse of discretion.

The judgment is affirmed.

COVINGTON, C.J., HOLSTEIN, BENTON, PRICE, ROBERTSON, JJ., and SMITH (GERALD), Special Judge, concur.

THOMAS, J., not sitting.