Shawn ALLEN, Plaintiff–Appellant,

v.

T. Keith GREBE, M.D. and Ob–Gyn Associates Of Joplin, Inc., Defendants–Respondents.

No. 21204.

Missouri Court of Appeals,
Southern District,
Division One.

June 30, 1997.

Motion for Rehearing and Transfer
Denied July 23, 1997.

Application to Transfer Denied
Sept. 30, 1997.

Glenn R. Gulick, Jr., Hershewe & Gulick, P.C., Joplin, for plaintiff-appellant.

Bruce E. Hunt, Jeffrey S. Monroe, Burkart & Hunt, P.C., Springfield, for Defendants-respondents.

GARRISON, Judge.

Shawn Allen ("Plaintiff") appeals from a judgment entered on a jury verdict in favor of T. Keith Grebe, M.D., and OB–GYN Associates of Joplin, Inc. ("Defendants") in an action for the wrongful death of her stillborn child, Kaitlyn. Plaintiff contends that the trial court erred in (1) overruling Plaintiff's motions to strike four venirepersons for cause, and in (2) overruling Plaintiff's motion to strike certain testimony given by Defendants' expert witness. We affirm.

Plaintiff was seen at OB–GYN Associates of Joplin, Inc. on November 3, 1992 for prenatal care, at which time it was noted that she had undergone a prior cesarean section and had a prior history of gestational diabetes and preeclampsia. Plaintiff was told about the importance of controlling her diabetic condition, a plan for her care was outlined including an appropriate diet and the use of insulin, and she was referred to a diabetic counselor.

Plaintiff was initially seen by Dr. Grebe, who was also a physician with OB–GYN Associates, on January 6, 1993, at which time an ultrasound scan was conducted, revealing no abnormalities. A second ultrasound performed on April 8, 1993, showed that Plaintiff's baby was larger than average. On May 6, 1993, Dr. Grebe examined Plaintiff again, noted good fetal movement, and scheduled a cesarean section for May 24, 1993.

On Sunday, May 16, 1993, Plaintiff experienced a sharp pain in her lower abdomen that lasted a few seconds. She became concerned and called Dr. Grebe, who told her to rest after informing her that the pain was most likely caused by a muscle spasm due to the size of her baby and the fact that she had undergone a prior cesarean section. When

asked at trial if it was unusual for women to complain of sharp abdominal pain late in their pregnancy, Dr. Grebe replied that "[i]t probably would be more unusual for them not to complain of sharp abdominal pain."

Plaintiff saw Dr. Grebe on May 19, 1993 for her last scheduled visit before her cesarean section. During that visit, it was discovered that there was no fetal heart activity, and Plaintiff's stillborn infant was delivered later that day by cesarean section. An autopsy failed to reveal the cause of death.

At the trial of Plaintiff's wrongful death suit, Plaintiff's expert witness, Dr. Choate, testified that the care and treatment provided to Plaintiff and her child did not meet currently accepted medical standards for the management of diabetes in pregnancy. In particular, Dr. Choate testified that if Defendants had conducted antepartum fetal surveillance,[1] the infant would have likely survived.

Dr. Grebe testified at trial that Plaintiff maintained exceptional blood sugar levels throughout the course of her pregnancy. He also stated that antepartum tests were not indicated or required in a gestational diabetic like Plaintiff who kept her blood sugars under excellent control. Defendants' expert witness, Dr. Rigg, concurred with Dr. Grebe's opinion. After reviewing the records, Dr. Rigg testified that he perceived no reason to schedule Plaintiff for antepartum testing at any time during the course of her pregnancy, and that the level of care received by Plaintiff and her baby was completely appropriate.

## POINT I

In Plaintiff's first point relied on, she argues that the trial court erred in overruling her motions to strike four venirepersons for cause. According to Plaintiff, "[t]he actions of the trial court in overruling each of these challenges for cause deprived Plaintiff of a fair trial, and denied Plaintiff the opportunity to meaningfully exercise her right to peremptory challenges as provided for by [§ 494.480, RSMo 1994]."[2] While Plaintiff exercised her peremptory challenges to strike three of the four venirepersons who were unsuccessfully challenged for cause (Nos. 1, 11, and 26), one of them, No. 8, ultimately served on the jury.

We need not review the qualifications of Nos. 1, 11, and 26 to determine if the trial court abused its discretion in refusing to remove them for cause. "A civil litigant does not have a right to a new trial if the trial judge requires him or her to use a peremptory challenge to remove a juror who should have been removed for cause." *Rodgers v. Jackson County Orthopedics, Inc.,* 904 S.W.2d 385, 389 (Mo.App. W.D.1995). "[T]he mere fact that a litigant, civil or criminal, was erroneously required to use a peremptory strike to remove a juror who should have been stricken for cause does not require grant of a new trial, so long as all 12 jurors who in fact sat on the jury were qualified." *Id.* at 391.

This court explicitly adopted the approach in *Rodgers* in the case of *Edley v. O'Brien,* 918 S.W.2d 898, 902 (Mo.App. S.D. 1996):

> This district agrees with the holding in *Rodgers* that a litigant in a civil case does not have a right to a new trial because he or she was required to exercise a peremptory challenge to remove a prospective juror who should have been removed for cause. So long as an unqualified juror who was not removed based on a proper challenge for cause does not serve in a civil case, there is no reversible error.

As a result, even assuming that Nos. 1, 11, and 26 were unqualified and should have been removed for cause, no reversible error occurred because they did not ultimately sit on the jury. However, one of the four venirepersons about whom Plaintiff complains, No. 8 (Mr. Mack Hutchison), did serve on the jury. It is, therefore, necessary that we consider Plaintiff's contention that her challenge for cause, as to that juror, should have been sustained.

---

1. Antepartum, or pre-birth, fetal surveillance includes non-stress tests, contraction stress tests, and a biophysical profile.

2. All statutory references are to RSMo 1994, unless otherwise indicated.

"The trial court possesses broad discretion in determining the qualifications of prospective jurors, and its ruling on a challenge for cause will not be disturbed on appeal unless it constitutes a clear abuse of discretion and a real probability of injury to the complaining party." *State v. Feltrop,* 803 S.W.2d 1, 7 (Mo. banc), *cert. denied,* 501 U.S. 1262, 111 S.Ct. 2918, 115 L.Ed.2d 1081 (1991). We are mindful that the trial court is in a better position to determine the qualifications of prospective jurors, and doubts as to the trial court's findings will therefore be resolved in its favor. *Ray v. Gream,* 860 S.W.2d 325, 331 (Mo. banc 1993). "The critical question in reviewing the exercise of discretion is whether the challenged venirepersons indicated unequivocally their ability to evaluate the evidence fairly and impartially." *Id.* at 331–32.

According to Plaintiff, "Hutchison evinced no personal bias against Plaintiff or in favor of Defendants. He was unqualified to serve only because of medical impairments." During voir dire, Hutchison indicated that he had a hearing problem, and that because he was required to take diuretics, he could not sit still for five or six hours and therefore could not be of service on a jury.

Section 494.425 provides, in pertinent part:

The following persons shall be disqualified from serving as a petit or grand juror:
  *    *    *    *    *    *

(9) Any person who, in the judgment of the court or the board of jury commissioners, is incapable of performing the duties of a juror because of mental or physical illness or infirmity.

As to Mr. Hutchison's health problem related to his diuretic, the court made the following independent inquiry into his condition and its effect on his ability to serve on the jury:

[COURT]: I'm going to inquire of you, Mr. Hutchison, after I make this comment.

The— the trial itself, while it may last throughout the week, will not be a marathon in the sense that we will ordinarily commence court at nine and release all of you at five. We'll take a lunch break,
ordinarily an hour at lunch, and each morning and each afternoon we will take a recess to permit you to remain as comfortable as possible throughout the day. You had mentioned, Mr. Hutchison, that you have your diuretic. With the explanation I have given, would it be physically possible for you to remain as a juror?

A: I hope it would, yes.

Plaintiff argues in her brief that "[i]t is well established in Missouri law that if a veniremen merely expresses his hope that he can try the case competently and impartially, this does not amount to an unequivocal statement that he can do so. . . ." In *Ray v. Gream,* 860 S.W.2d at 332, however, the Missouri Supreme Court said:

The fact that some of the jurors used imprecise language such as "I think I could" or "I would hope I could" does not necessarily make their responses equivocal. These expressions, we have noted, are merely the vernacular to express affirmative responses. We defer to the trial court's determination that the responses were not equivocal. (Citations omitted).

Plaintiff requested that Mr. Hutchison be stricken due to his medical problems. The trial court, however, indicated that it was not inclined to strike Mr. Hutchison "[e]ither because of the hearing or the health problems," and commented that it thought "he can hear the witnesses". The court then denied Plaintiff's motion to strike Hutchison for cause.

There is no doubt that the trial court was in a far better position than this court to evaluate Mr. Hutchison's ability to hear. Although the record reveals that Mr. Hutchison indicated he had a hearing problem, it also reveals that he did not appear to have trouble understanding questions posed to him during voir dire. In addition, the record indicates that the courtroom was equipped with an amplification system for the witnesses. As a result, we hold that the trial court did not abuse its discretion in overruling Plaintiff's motion to strike Hutchison for cause. In so holding, we also note that the nine jurors who signed the verdict for Defendants did not include Mr. Hutchison.

Plaintiff's Point I is denied.

## POINT II

In her second point on appeal, Plaintiff contends that the trial court erred in failing to strike the testimony of Dr. Lee Rigg, Defendants' expert witness. She argues that Dr. Rigg's testimony was irrelevant and immaterial, and that he was not competent to testify about the applicable standard of care because "during cross-examination the witness stated that he only knew what was done at his center and did not know what was done at most centers", and he thereby "admitted lack of knowledge of what was done generally by the profession or what other obstetricians would do under the same or similar circumstances".

■ "To qualify as an expert, a witness must have 'knowledge, skill, experience, training, or education' so that his or her opinion will probably aid the trier of fact." *MacDonald v. Sheets*, 867 S.W.2d 627, 630 (Mo.App. E.D.1993)(quoting § 490.065.1). "This determination is within the discretion of the trial court." *Id.* "[T]he experience and competence of a medical expert goes to the weight, not the admissibility, of his or her testimony." *Id.*

■ Dr. Rigg had originally obtained his training, and was board certified, in obstetrics and gynecology. He taught those subjects at Washington University in St. Louis, and at the University of Arkansas for a total of twelve years. He was also one of approximately 1,000 physicians worldwide who were board certified in the sub-specialty of maternal/fetal medicine, or perinatology, which is the branch of medicine dealing with high risk pregnancies. To become board certified in that sub-specialty requires four years, two written examinations, two oral examinations, and being published in the field. He had also authored medical articles and portions of medical texts. At the time of his testimony, he was director of the Division of Maternal/Fetal Medicine and chairman of the Department of Obstetrics at St. Luke's Hospital in St. Louis. He testified that he had managed 20 to 25 gestational diabetic pregnancies each year for the past 25 years, and had delivered approximately 10,000 babies after having cared for their mothers during pregnancy.

■ With regard to the standard of care in a medical malpractice case, the appropriate inquiry is whether the physician exercised the degree of skill and learning ordinarily used under the same or similar circumstances by members of their profession. *Koontz v. Ferber*, 870 S.W.2d 885, 890 (Mo.App. W.D.1993). In the instant case, Dr. Riggs testified on direct examination that, based upon his review of the records in this case, there was no indication that antepartum testing should have been performed on Plaintiff, and that such testing would not have prevented Kaitlyn's death. He was then asked:

Q: In your testimony today, when you've shared with us your medical opinion, have they all been to a reasonable degree of medical certainty?

A: Yes.

Q: Do you have an opinion as to whether Dr. Grebe and OB–GYN Associates of Joplin, Inc. in their care and management of Shawn Allen and her baby Kaitlyn exercised that degree of skill and learning ordinarily exercised under the same or similar circumstances by members of their profession? Do you have an opinion on that question?

A: Yes.

Q: What is your opinion?

A: My opinion is that the care and management was completely appropriate.

Plaintiff's attorney cross-examined Dr. Rigg primarily through the use of professional publications and texts. Numerous questions were posed to him concerning whether he agreed with various excerpts from a chapter in a medical book which he co-authored. He was also asked a series of questions about a document, referred to in the record as "Gabbe's paper", which he had apparently referred to in his deposition as containing information supporting his opinions. Plaintiff's counsel then asked Dr. Rigg questions about quotes from another text which apparently referred to studies by "Gabbe." He was asked the following:

Q: "Although previous studies by Gabbe, et al, 1977," which would be the article that

you cited me to support your opinion, right?

A: I don't know. Gabbe published a lot of stuff and it does say '77 A. That may be '77 B or C.

Q: Okay.

A: So I don't know if it's the same paper.

Q: It would be based on the same study thought, don't you think?

A: Not necessarily.

Q: Okay. "Although previous studies by Gabbe, et al, indicate that the stillbirth rate for gestational diabetic patients is similar to that for non-diabetic patients up to 40 weeks, most diabetics and pregnancy center [sic] now employ antepartum fetal heart rate surveillance for gestational diabetics prior to 40 weeks." Do you agree with that?

A: I can't answer if most of them do or not.

Q: You don't know?

A: I don't know. I know it's not done in my institution.

Q: Okay. But you don't know what most doctors do then—

A: I don't know what most centers do.

Q: Okay, fair enough.... Tell me if you agree with this or not, Doctor, "Gestational diabetics requiring insulin should generally undergo the same testing regimen as type one and type two diabetes." That is moms who have diabetes before they get pregnant, right?

A: That's what type one and type two are, yes.

Q: Right. Do you agree with that?

A: No, I don't. As I said earlier, gestational diabetes—diabetics that don't require insulin are just like anybody else. Those who do require insulin become normalized to be like anybody else. And so I never do those unless they have vascular complication.

Q: So I guess then you also would disagree with the next statement which says, "A typical protocol involves fetal movement counting beginning at 20 weeks and non-stress tests on a weekly basis from 36

to 40 weeks," you wouldn't agree with that?

A: I would not do that.

Q: But you don't know if they do in most centers, right?

A: Not in most centers. I don't think anyone could tell you what's done in most centers.

These answers form the basis for Plaintiff's motion to strike Dr. Rigg's testimony and for this point on appeal. As we understand Plaintiff's contention, she believes that this testimony indicated that Dr. Rigg had no personal knowledge of the appropriate standard of care, but rather relied solely on his own custom and practice, or that of the institution where he practices, thereby making his entire testimony irrelevant.

■ As Plaintiff points out, the individualized practice or custom of a physician does not constitute the appropriate standard of care. *See Koontz v. Ferber,* 870 S.W.2d at 890. Dr. Rigg's testimony, when considered in the context of Plaintiff's cross-examination, however, does not indicate that he was unaware of the standard of care commonly exercised by the ordinarily skillful, careful and prudent physician under the same or similar circumstances, or that he based his opinions on anything other than that standard.

Dr. Rigg testified on direct that Defendant's treatment of Plaintiff was appropriate based on the standard of care which both parties agree is applicable. On cross examination, he was asked if he agreed with a statement contained in a medical text which referred to the practice of most diabetes and pregnancy "centers". While his answers indicated that he did not know what most *centers* did, they did not necessarily indicate that he was unaware of, or was not applying, the appropriate standard of care. Plaintiff's counsel attempted to interpose "doctors" for "centers" by asking Dr. Rigg "you don't know what most doctors do then—" to which he replied, "I don't know what most centers do."

Dr. Rigg's qualifications to express opinions on the standard of care were undisputed on direct examination. His testimony indi-

cated that he was familiar with the medical literature on the subject, and, in fact, he had authored some of it. In addition to being one of approximately 1,000 physicians worldwide who are board certified in the subspecialty applicable to the issues in this case, he had also trained physicians to practice in this field.

At most, the testimony upon which Plaintiff relies went to the weight of Dr. Rigg's testimony and not its admissibility. Plaintiff's second point is denied.

Judgment affirmed.[3]

BARNEY, P.J., and PREWITT, J., concur.

---

**3.** Defendants filed two motions that were taken with the case: a Motion to Dismiss the Appeal and a Motion for Sanctions for Frivolous Appeal. The Motion to Dismiss alleges that Plaintiff's brief violates Rule 84.04(c), in that the statement of facts "is replete with self-serving, argumentative and biased statements directly contrary to the provisions of Rule 84.04(c)." The Motion for Sanctions for Frivolous Appeal seeks an award of sanctions pursuant to Rule 84.19. Both motions are denied.