Debbie BANTHER, Plaintiff–Appellant,

v.

Dr. Steven M. DREW, Defendant–Respondent.

No. 26466.

Missouri Court of Appeals,
Southern District,
Division One.

Sept. 12, 2005.

Eric M. Belk and Brad Bradshaw, Springfield, MO, for appellant.

David E. Overby and Kent O. Hyde, Hyde, Love & Overby, LLP, Springfield, MO, for respondent.

PHILLIP R. GARRISON, Presiding Judge.

Debbie Banther ("Plaintiff") appeals from a judgment entered on a jury verdict in favor of Dr. Steven M. Drew ("Defendant"), a practicing physician, in an action for the wrongful death of her twenty-two-year-old daughter, April Banther ("April"). Plaintiff contends that the trial court erred in refusing to give a verdict directing instruction offered by her. We agree and reverse the judgment.

At approximately 10:45 p.m., January 24, 2001, April went to the Aurora Community Hospital's Emergency Room in Aurora, Missouri, where she reported to the triage nurse that she had shortness of breath and had been coughing for a least a week. Defendant saw April shortly after midnight, at which time he reviewed the triage nurse's assessment and talked with her about her symptoms including the fact that she was not coughing anything up.

Defendant listened to both her lungs and found that she had some wheezing, but nothing he considered alarming. Defendant decided that April did not have the usual symptomatology of pneumonia, such as fever, labored respiration, or a productive cough. He did not order any tests that would rule out pneumonia as a cause for April's distress and diagnosed her with asthmatic bronchitis. Defendant ordered a breathing treatment for April, which resulted in a significant improvement of her air flow, and as a result further convinced Defendant that she had asthmatic bronchitis. After April told Defendant that she felt better and could breathe easier he instructed a nurse to discharge her with a four ounce bottle of Robitussin AC, with a prescription for an additional four ounces if needed, and a medium-dose inhaler with Albuterol together with instructions on their use.

Plaintiff, with whom April lived, awoke around 7:00 a.m. that morning and found April sitting up in a chair because she was having trouble breathing lying down. April told her that she had been to the emergency room during the night and was diagnosed with a viral infection. Plaintiff and April decided to drive to Marshall, Missouri, later that afternoon. On the way back to Aurora April found that she could not eat and breathe at the same time. When they arrived in Aurora Plaintiff took April to the emergency room because her condition had worsened to the extent she could hardly move and breathe at the same time. She was seen by Dr. Andelin, who within an hour ran a CBC (common blood count) test, chest x-ray and blood gases and decided that she needed to be transferred to St. John's Hospital in Springfield, Missouri, in case she needed to be put on a mechanical ventilator.

April was treated at the St. John's Emergency Room in the late evening of January 25, 2001, where she was considered to be in need of critical care and was referred to Dr. Donald K. Wantuck ("Dr. Wantuck"), a pulmonologist. Dr. Wantuck found that April had exceptional breathing problems, some of which were related to the nature of her illness and some related to her physical status. April was 5'2" tall, weighed 250 pounds, and was a smoker, which led to "a lot of impairment of her mechanical breathing apparatus." After a battery of tests and treatment, Dr. Wantuck diagnosed April with "bilateral pneumonia of undetermined origin." April died on January 27, 2001.

■ Plaintiff's only point relied on is that the trial court erred in not giving her tendered verdict director, Instruction C, which read:

Your verdict must be for [Plaintiff] if you believe:

First [Plaintiff] was the natural mother of the deceased, [April], and

Second, either:

Defendant failed to order a chest x-ray of [April] on the January 24, 2001 emergency room admission, or

Defendant failed to order a CBC (complete blood count) of [April] on the January 24, 2001 emergency room admission, or

Defendant failed to prescribe antibiotics to [April] on the January 24, 2001 emergency room admission, and

Third, Defendant, in any one or more of the respects submitted in

paragraph Second was thereby negligent, and

Fourth, such negligence directly caused or directly contributed to cause the death of [April].

At the outset we note that Plaintiff has failed to supply this court with the actual verdict director that was given to the jury at trial. Ordinarily this failure would

make it difficult for an appellate court to consider an instructional challenge.[1] However, from the record before us, we gather that the instruction given allowed the jury to find for Plaintiff if they were to determine that Defendant negligently failed to order either a chest x-ray or CBC of April during her January 24, 2001, visit to the emergency room. Instruction C, however, would have allowed the jury to render a verdict in favor of Plaintiff if either of the above were found, or if they found he negligently failed to prescribe antibiotics.

The sole issue in this appeal is whether there was enough evidence at trial to support the submission of Plaintiff's claim that Defendant was negligent in failing to administer antibiotics upon April's January 24, 2001, visit to the emergency room. Plaintiff asserts that the testimony elicited from her expert witnesses provided the basis for giving this instruction. We agree.

To make a prima facie case for medical malpractice, "plaintiffs must prove that defendants failed to use that degree of skill and learning ordinarily used under the same or similar circumstances by members of defendants' profession and that their negligent act or acts caused plaintiffs' injury." *Washington by Washington v. Barnes Hosp.*, 897 S.W.2d 611, 615 (Mo. banc 1995). Whether an issue has been sufficiently proven at trial to be submitted to the jury "is a legal question and not an exercise of judicial discretion." *Deckard v. O'Reilly Automotive, Inc.*, 31 S.W.3d 6, 18 (Mo.App. W.D.2000) (overruled in part on other grounds). In order for a claim to be properly submitted to the jury "each fact essential to liability" must be "predicated upon legal and substantial evidence." *Id.* at 18.

When considering whether a submissible case has been made all the evidence is to be construed in the light most favorable to the plaintiff. *Hiers v. Lemley*, 834 S.W.2d 729, 732 (Mo. banc 1992); *Ladish v. Gordon*, 879 S.W.2d 623, 627–628 (Mo.App. W.D.1994). Appellate courts are to give the "plaintiff the benefit of all favorable evidence and reasonable inferences" drawn therefrom, to the exclusion of all contrary evidence. *Ladish*, 879 S.W.2d at 627–628. Furthermore, in cases involving disjunctive instructions each alternative claim of negligence must be able to stand alone and there must be sufficient evidence to support each allegation. *Id.* at 628.

In the instant case although Plaintiff called two experts, Dr. Dale Kesl's ("Dr. Kesl") testimony was sufficient to show that the Defendant breached his duty of care by not administering antibiotics and that breach caused or contributed to April's death.

At the outset of his testimony Dr. Kesl stated that his opinion would be based on a reasonable degree of medical certainty; that his opinions would be based on facts and data of the type reasonably relied on by experts in the field of emergency medicine and the diagnosis and treatment of lung conditions; and that references to "improper health care" would mean "[f]ailing to use that degree of skill and learning ordinarily used under the same or similar circumstances by members of the [D]efendant's profession." Dr. Kesl then gave the

---

1. Defendant also argues that we should dismiss this appeal because Plaintiff's brief does not comply with Rule 84.04, Missouri Rules of Civil Procedure (2004). While Plaintiff may not have submitted a model brief, Defendant was able to identify the issues on appeal and file a response that addressed those issues. As such we decline Defendant's invitation to dismiss for violation of Rule 84.04.

following testimony about the level of care April received on January 24, 2001:

Q. Based upon your training and experience and your review of the medical records, x-rays, depositions, do you have an opinion as to whether the health care provided to April on January 24th by [Defendant] was improper or not?

A. Yes, I do.

Q. And what is your opinion?

A. I feel that the standard of care was not met.

Q. What are the main things that stand out in your mind, the main things that were improper?

A. Patient received a clinical evaluation but received no laboratory testing to absolutely rule out the possibility of significant pneumonia. The—there was no chest x-ray; there was no laboratory; there was *no antibiotics prescribed.* (emphasis added).

Shortly thereafter Dr. Kesl explained that his diagnosis, based upon the Defendant's examination of April as well as other information available to him on the night of January 24, 2001, would have been "more of a bronchial pneumonia or pneumonia on the right side"; rather than bronchitis as Defendant diagnosed.

■ On cross-examination Dr. Kesl made his opinion explicit as he stated that even without a positive result on the chest x-ray, he would have prescribed antibiotics:

Q. Now, do you believe that she should have been sent home with oral antibiotics or put in the hospital on IV antibiotics?

A. I think if I would have initially seen that patient *and I would have had a negative chest x-ray,* because I would have done the chest x-ray, *I would have sent her home on the minimum of an oral antibiotic in the macrobiotic class.* The one I would have chosen would be Zithromax, as well as the puffer, and I would not have given a codeine cough suppressant. I would have given a cough suppressant, but I would have probably used either just plain Robitussin or Robitussin DM.[2] (emphasis added).

Dr. Kesl also explained that Defendant's failure to administer antibiotics directly caused or contributed to April's death:

Q. If we go back to April's condition again, and the problems she had when it progressed, when she first had these things on the 24th do you have an opinion as to whether or not, if the proper care had been given, that is the failures had not been done, if she would have had a chest x-ray, she would have had the CBC or—I'm sorry—or she would have been given antibiotics or any of those things, do you believe more probably than not she would have lived or not?

A. Yes.

. . . .

---

2. We note that "the individualized practice or custom of a physician does not constitute the appropriate standard of care." *Allen v. Grebe,* 950 S.W.2d 563, 568 (Mo.App. S.D. 1997). There is no issue on this appeal concerning Dr. Kesl's testimony about what he would have done. Additionally, he began his testimony by explaining that all his opinions were going to be based upon facts and data of the type relied on by experts in the fields of emergency medicine and the diagnosis and treatment of lung conditions. Thus, taken in context of his overall testimony we do not believe he was testifying as to his own personal, subjective beliefs; rather he was expressing his objective opinion as to what other doctors would have done under the same or similar circumstances. *See Id.*

Q. And you believe that if the appropriate things would have been done, she would have more probably than not have lived rather than died from this condition?

A. Yes. Young people with community-acquired pneumonias are very survivable.

Q. Do you believe that she had a bacterial pneumonia or not? What is your impression on that?

A. I believe it's bacterial.

 In order for Instruction C to have been supported, the Plaintiff must have presented evidence of the "essential facts"; which in this case are those facts that would have shown that Defendant failed to act with the requisite level of medical care by not administering antibiotics to April on January 24, 2001, and that failure caused or contributed to April's death. *See Deckard*, 31 S.W.3d at 18; *see also Ladish*, 879 S.W.2d at 628. Enough evidence must be placed before the jury so that they are not left to mere "speculation, conjecture and surmise" in connecting the facts at hand with the claims upon which the plaintiff seeks relief. *Ladish*, 879 S.W.2d at 628; *Cowan v. Perryman*, 740 S.W.2d 303, 304 (Mo.App. S.D.1987). "Substantial evidence is that evidence which, if true, is probative of the issues and from which the jury can decide the case." *McCrackin v. Plummber*, 103 S.W.3d 178, 181 (Mo.App. W.D.2003) (quoting *Butts v. Express Personnel Servs.*, 73 S.W.3d 825, 839 (Mo.App. S.D.2002)). Here Dr. Kesl's testimony, when considered in the light most favorable to Plaintiff, constituted substantial evidence that Defendant violated the applicable standard of care and that it caused or contributed to April's death.

Defendant alleges that the evidence tended to show that Defendant could only be negligent for failing to administer antibiotics if he had first diagnosed or suspected pneumonia. Therefore, he argues, if Defendant was not negligent in failing to diagnosis pneumonia, i.e. failing to conduct a chest x-ray or a CBC, he could not have been negligent for failing to administer antibiotics. That thesis is contrary to Dr. Kesl's testimony. He stated that even if he had gotten *negative* results from a chest x-ray of April, Defendant still should have given her antibiotics. Viewed in a light most favorable to Plaintiff, the evidence tends to show that Defendant had a duty to administer antibiotics based upon the information he had available to him on January 24, 2001, regardless of whether he had conducted any further testing.

 Dr. Kesl also provided substantial evidence that Defendant's failure to administer antibiotics caused or contributed to April's death. He opined that had April been prescribed or given antibiotics, a chest x-ray or a complete blood count on January, 24 2001, she would have probably lived.[3] While this was the only testimony from Dr. Kesl as to causation, it was enough to constitute "substantial" evidence. *See McCrackin*, 103 S.W.3d at 181; *Ladish*, 879 S.W.2d at 628.

 It is not for this court to pass on the credibility of the evidence, but rather to assess whether there was "substantial evidence" as to the claim Plaintiff sought to submit to the jury. *McCrackin*, 103 S.W.3d at 181. "Substantial" does not necessarily mean quantity or even quality, it simply means that the evidence relied on must be probative of the issues it was

---

3. "To make a prima facie showing of causation, the plaintiff must show the defendant's negligent conduct more probably than not

was a cause of the injury." *Nisbet v. Bucher*, 949 S.W.2d 111, 115 (Mo.App. E.D.1997).

offered to prove. *Id.* While the evidence concerning antibiotics was not overwhelming, that which was presented tended to prove that Defendant had a duty to administer antibiotics to April regardless of whether he conducted a CBC or a chest x-ray, that he did not do so, and that this omission caused or contributed to April's death.

After taking all Plaintiff's evidence as true and drawing all reasonable inferences from such in favor of Plaintiff, the testimony that was put before the jury was probative of the "essential facts" necessary to support giving Instruction C to the jury. Accordingly we reverse the judgment and remand for further proceedings.

PREWITT and RAHMEYER, JJ., concur.